2024 IL App (1st) 231530

FIRST DISTRICT
SECOND DIVISION
February 27, 2024

No. 1-23-1530

| | | |
|---|---|---|
| *In re* D.P., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 21 JA 959 |
| v. | ) | |
| | ) | |
| B.P., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Patrick T. Murphy, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, B.P., appeals the trial court's order finding him to be unfit under section 1(D)(b), (m), and (n) of the Adoption Act (750 ILCS 50/1(D)(b), (m), (n) (West 2020)) and terminating his parental rights over D.P., his minor son. He argues that the trial court's finding was against the manifest weight of the evidence because the State did not establish by clear and convincing evidence that (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to D.P.'s welfare in violation of section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)) and section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2020)), (2) he had failed to make reasonable efforts to correct the conditions that were the basis for the removal of D.P. and reasonable progress toward the return of D.P. under

section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2020)) and section 2-29 (705 ILCS 405/2-29 (West 2020)), and (3) he had demonstrated an intent to forego his parental rights by failing to visit or communicate with D.P. or the agency under section 1(D)(n) (750 ILCS 50/1(D)(n) (West 2020)) and section 2-29 (705 ILCS 405/2-29 (West 2020)).

¶ 2    Respondent is the natural father of the minor, D.P., born on January 18, 2020.[1] On October 19, 2021, the State filed a petition for the adjudication of wardship of D.P. and named both parents. The petition alleged that D.P. was neglected under the Juvenile Court Act because he was not receiving the proper and necessary support for his well-being and due to an injurious environment (*id.* § 2-3(1)(a), (b)) and abused under the Juvenile Court Act because his parents created a substantial risk of physical injury to such minor by other than accidental means that would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother has one prior indicated report for substance misuse. Mother has four other minors who were in DCFS custody in Winnebago County with findings having been entered. Putative father is the parent of three of those minors. On or about August 8, 2021 the family's apartment was observed to be dirty with a strong odor of urine and feces emitting from the home. The sofa cushions were observed to be soaked with urine and there were bags of garbage in the floor which contained dirty adult diapers. Maggots were observed in the corner of the floor. On September 1, 2021 a safety plan was created and then subsequently modified on two separate occasions after it was violated. Mother would return to

---

[1] D.P.'s natural mother J.B. is not a party to this appeal.

the family's apartment with this minor each time the safety plan was violated. Putative father admits that earlier this year he overdosed after he had ingested marijuana which had been laced with fentanyl. Putative father states that this minor was present during this incident. Putative father refuses to participate in a random drug test. Mother tested positive for cocaine on or about September 13, 2021. Mother denies using illegal substances. On October 11, 2021 putative father was involved in a physical altercation with another adult. Mother attempted to intervene in this altercation and was injured. This minor was present during this altercation. On October 12, 2021 putative father was shot right outside the family's residence after he was involved in altercation with another adult. This minor was present in the home when putative father was shot. Parents reside together and paternity has not been established."

¶ 3    On October 29, 2021, the court entered a paternity order finding that respondent is the father of D.P. On February 22, 2022, the trial court entered an adjudication order and found D.P. was abused or neglected based on an injurious environment because the "agency tried to assist mother, agency did what they could do, mother and child not living with father, mother saw father shot outside his abode, mother injured in other incident with father and minor." On April 20, 2022, the court entered the disposition order adjudging D.P. a ward of the court and finding both J.B. and respondent were unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor. The Department of Children and Family Services (DCFS) was named the guardian administrator. The permanency order entered on April 20, 2022, indicated that the permanency goal was return home within 12 months. The order also noted that D.P. was "thriving in his current placement. Mother's whereabouts have been

unknown since December 2021. Father was recently released from jail (March 2022). The agency will refer father to additional services. Father is currently visiting."

¶ 4    The next permanency order from September 2022 indicated a goal of return home pending status hearing and that neither parent had made substantial progress. The reasons for this goal stated, "The parents' current whereabouts are unknown. The parents are not participating in reunification services or visits. [D.P.] is placed in a home where he can achieve permanency. [D.P.] is participating in developmental services and is thriving in placement." The December 2022 permanency order changed the permanency goal to substitute care pending court determination on termination of parental rights. The reasons for this goal stated that D.P. was thriving in a preadoptive home and the parents were not involved in services or visitation with their whereabouts unknown.

¶ 5    In February 2023, the State filed its petition for the termination of parental rights for both parents and alleged they were unfit under grounds (a), (b), (c), (m), and (n) of the Adoption Act. 750 ILCS 50/1(D)(a), (b), (c), (m), and (n) (West 2020). The State also filed a pleading specifying the nine-month time period for ground (m) under the Adoption Act was March 20, 2022, through December 20, 2022. *Id.* § 1(D)(m). On June 30, 2023, the court entered a default order against J.B. for want of appearance.

¶ 6    On August 18, 2023, the trial court conducted the termination hearing with respondent present in person and represented by counsel. The following evidence was adduced at the hearing.

¶ 7    Maurquisha Williamson testified that she was employed as a caseworker with DCFS and was assigned to D.P.'s case in September 2022. Respondent was referred for services, including parenting capacity assessment, parent coaching, substance abuse treatment, domestic violence,

and individual therapy. When she was first assigned to the case, respondent's whereabouts were unknown until she was informed in court that he was incarcerated. When asked if respondent had participated in any of the referred services, Williamson responded not to her knowledge.

¶ 8    Prior to April 2023, respondent's whereabouts were unknown and DCFS performed diligent searches for him. Williamson was given two addresses, she went to both locations, and both were abandoned. She was also given six different telephone numbers, and she tried calling each number. She was aware that respondent had some visits with D.P., but prior to April 2023, the last visit was in June or July 2022. Respondent had never been granted unsupervised visitation, and no recommendation had been made to have unsupervised visitation because respondent was not involved in services, visits were inconsistent, and communication with the caseworker was also inconsistent. Prior to April 2023, Williamson testified that to the best of her knowledge no cards, gifts, or letters were sent to D.P. by respondent. Williamson was unaware of any reason preventing respondent from contacting the agency prior to April 2023.

¶ 9    Williamson's last contact with respondent was a supervised virtual visit with D.P. on August 7, 2023, which was the only virtual visit that occurred since April 2023. Once she had contact with respondent, Williamson talked to him about efforts to comply with services and visitation. He told her that he was active in a parenting class while incarcerated, but Williamson had not received any documentation for this class. She was not aware that respondent engaged in domestic violence classes, substance abuse classes, or anger management classes.

¶ 10    Williamson was aware that respondent was in the Cook County Department of Corrections since at least April 2023. She attempted to reach out to respondent by calling the jail. She was informed that in-person visitation with a child was not available due to COVID-19, but she was told about the virtual visit option. She then staffed the virtual visit on August 7, 2023.

5

Since December 2022, the agency has not considered a request for a change in the permanency goal to return home because respondent was not consistent in the case with both services and visits.

¶ 11    Respondent testified that he had been incarcerated in the Cook County Department of Corrections since March 16, 2023. While incarcerated, he had completed domestic violence, anger management, parenting, and substance abuse classes.

¶ 12    When asked if he informed DCFS that he was incarcerated, respondent stated that he "informed them through their officers to get a hold of my attorney and stuff." He conceded that he was not in contact with the agency prior to his incarceration because he had "concussions" from being shot in the head and had anxiety. Respondent admitted that he was also incarcerated when D.P.'s case first came to court and that respondent had been shot in the head prior to that incarceration. He communicated with the agency then and did virtual visits and a couple of in-person visits, but he disappeared in July 2022. Respondent testified that he did not know how to contact the agency because J.B. was the one who got in touch with the caseworkers. He was not in touch with J.B. and had not seen her since he was incarcerated.

¶ 13    The parties stipulated to the admission of several exhibits, including the service plan, the integrated assessment, and the referral forms. The DCFS referral form described how the case came to its attention as follows:

> "[J.B.], [respondent], and their 1-year-old son [D.P.] came to the attention of DCFS on 8/9/21 due to reports of unsanitary environmental conditions in their home. It was also reported that [D.P.] had witnessed his father, [respondent's], overdose on substances and that [J.B.] subsequently tested positive for substances during the pursuant investigation. It was reported that [J.B.] and [D.P.] relocated

to 2 different homes of [respondent's] relatives under a safety plan, due to the household environmental conditions. It was reported that both relatives refused to continue offering shelter to [J.B. and D.P.], leaving them without housing. Per this document, the Child Protection Investigator had been unable to establish contact with [J.B.] for several days in early October 2021. It was later reported that on 10/11/21, [D.P.] witnessed [J.B.] become injured when she intervened in a physical altercation between [respondent] and another individual. It was reported that the following morning, this individual wounded [respondent] by a gunshot in the front entrance of the family's home while [D.P.] was present in the home. Due to these escalating safety concerns, [D.P.] was taken into Protective Custody *** on 10/14/18 [*sic*] and Temporary Custody was granted on l0/18/21. [D.P.] was placed in a traditional foster home."

¶ 14    Respondent's integrated assessment disclosed that he and J.B. had been in a relationship for approximately 20 years and they began dating when she was 14 and he was 19. They had three other children, the oldest was born in 2006 when J.B. was 17 and respondent was 22. A case opened with DCFS concerning the other children in 2012. Respondent denied a history of domestic violence. However, a 2013 partner abuse assessment reported respondent had engaged in recurring emotional, physical, and sexual abuse of J.B. The 2013 assessment stated that respondent's abuse of J.B. "consisted of suicide threats, strangulation, stalking, sexual abuse and head trauma leading to loss of consciousness." Respondent was in detention when the third child was born in 2009. The parental rights for respondent and J.B. were terminated for these children in January 2016.

¶ 15    Respondent and J.B. resided together with his mother throughout D.P.'s life. J.B. reported that respondent and his mother frequently fought. A Law Enforcement Agencies Data System (LEADS) report from November 2021 disclosed respondent had seven convictions for burglary, three convictions for dangerous drugs, three convictions for larceny, and three convictions for traffic offenses. He also had several charges for other offenses that did not result in convictions. Respondent reported that five months prior to the assessment he had smoked a "poisoned" marijuana cigarette. It had been reported that respondent had overdosed on a prior occasion when he smoked a marijuana cigarette tainted with fentanyl. Respondent has a history of seizures and used marijuana to alleviate his symptoms. He also reported memory loss following his gunshot wound to the head from October 2021.

¶ 16    Respondent reported that he participated in the daily care of D.P. and D.P. was attached to him. D.P. was never abused. A case note stated that D.P. had missed two well-child visits and the foster parent had reported that D.P. had tooth decay. The case came to DCFS because of reports regarding the living conditions. The home environment had mold and maggot infestation and furniture soiled by urination caused by respondent's mother's illness. D.P. entered DCFS custody when it was reported that D.P. was in the home at the time respondent was shot.

¶ 17    The following services were recommended for respondent: parenting capacity assessment, adhere to all terms of his legal involvement, individual therapy, substance assessment/treatment, domestic violence assessment/treatment, parenting education, and consistent, supervised visitation and communication with D.P.

¶ 18    The April 2022 service plan reviewed the progress from October 2021 to April 2022. Since the prior review, respondent had been released from prison in March 2022. He was not in services but was working with the caseworker to get into services. The plan stated that

respondent received multiple referrals for his services. The progress toward the goal of return home was unsatisfactory. The October 2022 service plan reviewed the period from April 2022 to October 22. The plan observed that the whereabouts of both J.B. and respondent were unknown. D.P. had not seen either of his parents since July 2022. Williamson had been assigned as the caseworker and she had not been able to communicate with respondent to discuss his progress with his services. The progress toward the permanency goal was unsatisfactory.

¶ 19    The April 2023 service plan reviewed the progress from October 2022 to April 2023. The plan pointed out that Williamson, the caseworker, "still has not had any contact with either birth parent since [she] was assigned to the case." She went to two possible addresses for respondent, but respondent did not appear to live at either residence and the addresses "seemed vacant." The plan also indicated that neither parent had been involved in the case and had not seen D.P. since July 2022. Respondent was rated unsatisfactory in complying with services. The permanency goal had been changed in December 2022 to the termination of parental rights.

¶ 20    After the parties presented their arguments, the trial court found by clear and convincing evidence that respondent was unfit under grounds (b), (m), and (n) of the Adoption Act. *Id.* § 1(D)(b), (m), (n). The court made the following findings on the record.

> "This case came in in [*sic*] October of '21. Almost two years ago. And neither
> parent has been involved here. It came in when the child was about a year and a
> half. Well, almost. Three months short of [2] years. Right now, he is several
> months short of 4 years. He spent more than half of his life in foster care.
>
> Neither parent has made any significant effort I find by clear and
> convincing evidence. The father did get involved after he was incarcerated in

March. But, you know, by then the horse has already escaped the barn and it was too late to close the barn door.

I assume he did complete all the services and I do accept his testimony. It was after the case was in the system for 18 months. And he showed no reasonable degree of responsibility here. You know, he knew his child was in care. It wasn't as if he rolled over one day and said, hey, I wonder what happened to little [D.P.] He knew the child was in care.

And so frequently here parents basically take the position well, the agency didn't do what it had to do to get in touch with me. You know, the parent as Ground B points out, you have to have responsibility toward your own children. For whatever reason, I understand in many cases, parents have problems.

But, in this case, I find Ground N as in Nancy, B as in boy, M as in Michael by clear and convincing evidence that both parents are unfit."

¶ 21    The court then proceeded to the best interest portion of the hearing. Williamson testified to the best interest of D.P. At the time of the hearing, D.P. was 3 years old and had been in his current placement since the case opened after a placement with paternal relatives did not last. The foster family consisted of a mother, father, and their two children. Williamson completed her background review on all adults in the home, and her last home visit was on August 7, 2023. Williamson found the placement safe and appropriate with no signs of abuse, neglect, or excessive corporal punishment. She did not have any other concerns or any unusual incident reports. Williamson observed D.P. interact with his foster parents. He calls the foster parents "mama" and "daddy." He has a close relationship with the two biological children and feels comfortable in the home. The foster family has included D.P. in family gatherings and family

vacations. Both foster parents pick him up or take him to day care. D.P. goes to the events of the biological children, like the ballet. D.P. does not have any special needs and does not need services. Williamson had visited D.P. at daycare and spoke with the staff about his interaction with his peers. If the foster parents were unavailable to take care of D.P., they have relatives to care for him. The foster parents are willing to provide commitment to D.P. and have signed a permanency commitment. In her observations, Williamson found the foster parents provide a safe and nurturing environment, including giving hugs and kisses, and providing meals and snacks. Williamson also talked to other relatives, and all were pleasant. D.P. is integrated into the extended family.

¶ 22    Williamson testified that, after meeting with her supervisor, DCFS found it was in the best interest of D.P. that parental right be terminated and D.P. be provided a "forever home." The basis of this recommendation was due to inconsistent communication and inconsistent services by the parents.

¶ 23    The foster parents appeared via Zoom and informed the court that they want to adopt D.P. The foster mother said she believed they were asked if they wanted to adopt D.P. within a couple of weeks of meeting him and they said yes then as well. D.P. "has just been a part of our family since the day he came. We love him and our daughters love him. And he just you know fits right in with our family." The foster family was in Michigan at an extended family gathering with grandparents, aunts, uncles, and cousins. D.P. was running around with his cousins. She said the family was "really excited to make that permanent."

¶ 24    The foster father also addressed the court. When they first signed up to become foster parents, he "never imagined that you could love and care for a child that you didn't give birth to

the same way you do your other kids. And it's just been an eye opening experience. He is such a wonderful child. He is such a loving and caring child."

¶ 25    Following arguments, the court found it was D.P.'s best interest to terminate respondent's parental rights.

¶ 26    This appeal followed. Respondent timely filed a notice of appeal on August 28, 2023, listing the order terminating his parental rights for D.P. Accordingly, this court has jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 27    On appeal, respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. Specifically, he contends that the State failed to establish by clear and convincing evidence: (1) his failure to maintain a reasonable degree of interest, concern, or responsibility as to D.P.'s welfare pursuant to ground (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)); (2) his failure to make reasonable efforts or progress toward reunification from March 20, 2022, through December 20, 2022, pursuant to ground (m) of the Adoption Act (*id.* § 1(D)(m)); and (3) his demonstrated intent to forego his parental rights by failing to visit or communicate with D.P. or the agency pursuant to ground (n) of the Adoption Act (*id.* § 1(D)(n)).

¶ 28    Respondent does not challenge the trial court's best interest finding at the termination hearing. Accordingly, respondent has forfeited any argument that the trial court's best interest ruling was against the manifest weight of the evidence, and we will not discuss that finding any further. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 29     " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). "Illinois policy 'favors parents' superior right to the custody of their own children.' " *Id.* (quoting *In re E.B.*, 231 Ill. 2d at 464).

¶ 30     The termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2020); 705 ILCS 405/2-29(2) (West 2020). "Parental unfitness must be proven by clear and convincing evidence." *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 196. "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). Second, "[a]ssuming the parent is found unfit, the circuit court must then consider whether it is in the best interests of the children to terminate parental rights." *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. " 'When ruling on parental unfitness, a court is not to consider the child's "best interests." ' " *In re M.I.*, 2016 IL 120232, ¶ 20 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990)). Each case concerning parental unfitness is considered *sui generis* and is decided on its own facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d at 354. "A court may not terminate a parent's rights on grounds not charged in the petition. At the same time, however, the State is not required to prove every ground it has alleged for finding a parent unfit." *Id.* at 349. "A trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47 (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)).

¶ 31     This court will not disturb a finding of unfitness unless it is contrary to the manifest

weight of the evidence and the record clearly demonstrates that the opposite result was proper. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 78. We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not reweigh the evidence anew on appeal. *Id.* This court will only find the trial court's ruling to be against the manifest weight of the evidence when the opposite conclusion is clearly evident from a review of the evidence presented. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 32    The termination petition for D.P. alleged that respondent was unfit under multiple sections of the Adoption Act, including section 1(D)(b), (m), and (n). 750 ILCS 50/1(D)(b), (m), (n) (West 2020). After the unfitness hearing, the trial court found respondent unfit under those three grounds.

¶ 33    We first review the trial court's finding that respondent was unfit pursuant to section 1(D)(b) of the Adoption Act, for his failure to maintain a reasonable degree of interest, concern, or responsibility as to D.P.'s welfare. *Id.* § 1(D)(b). Because the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 49. A finding of unfitness under ground (b) is based on a subjective analysis. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. This ground does not focus on the parent's success but, rather, the reasonableness of his or her efforts and takes into account the parent's difficulties and circumstances. *Id.* However, simply because a parent demonstrates some interest or affection toward his or her child does not render his or her fit under this ground; rather, his or her interest, concern, and/or responsibility must be reasonable. *Id.* " '[N]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under

[ground] (b).' " *Id.* (quoting *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Unlike ground (m), ground (b) has no time constraint that limits our consideration of respondent's fitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50.

¶ 34     Respondent argues that the record established that he was an active caretaker for D.P. prior to the DCFS case and continued visitation from November 2021 until June or July 2022. He contends that he disappeared from DCFS's "radar" from July 2022 to April 2023 due to depression, J.B. being missing, and the aftereffects of being shot in the head. He sought contact with DCFS after he was incarcerated again in March 2023 and then began working on the recommended services in April 2023.

¶ 35     Contrary to respondent's contentions, the record below overwhelmingly supports the trial court's finding that respondent was unfit to be a parent on the basis of his failure to "maintain a reasonable degree of interest, concern or responsibility" as to his son's welfare. 750 ILCS 50/1(D)(b) (West 2020). Specifically, the evidence presented at the unfitness hearing demonstrated that respondent disappeared for nine months with no contact to DCFS or D.P., he was repeatedly incarcerated, he had, at best, sporadic visitation with D.P., and he failed to participate in any of the services for the nearly two years the case was ongoing. Since the case was opened, the only period in which respondent was both out of jail and in contact with D.P. was the three to four months from March 2022 to June or July 2022. "It is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the child may support a finding of unfitness under both sections (b) and (m)." *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 36     DCFS opened this case in October 2021 when D.P. was approximately 20 months old, after the minor was present when respondent first got into an altercation with an individual and

15

later when that individual returned and shot respondent in the head. Respondent, who had been on parole, was taken back into custody and remained incarcerated until March 2022. Upon his release, respondent received multiple referrals in accordance with the service plan and engaged in some supervised visitation with D.P. Significantly, a few months later, respondent disappeared and his whereabouts were unknown from June or July 2022 until March 2023 when respondent was again incarcerated. It was only after he was in custody that respondent asked to be put in contact with DCFS. While in custody, respondent testified that he began to take some of the required classes that he had been recommended in 2021, such as, domestic violence, anger management, parenting, and substance abuse classes. He had not previously started any of the required services. Respondent did not report these classes to Williamson in their August 2023 phone conversation, nor did he provide any documentation to DCFS verifying his completion of any class. He had one video visitation with D.P. in August 2023, the first visitation in more than a year. Respondent was still in custody at the time of the termination proceedings. No evidence was presented that respondent called, sent cards, or made any other attempted contact with D.P. during the pendency of the case. None of the service plans had found that respondent had been satisfactory in his efforts to comply with the recommended services to work towards regaining custody of D.P.

¶ 37    While respondent has expressed his care for D.P. at the unfitness hearing, the record repeatedly shows that he failed to maintain a reasonable degree of concern and responsibility toward D.P.

> "[T]he plain meaning of the phrase '[f]ailure to maintain a reasonable degree of
> interest, concern or responsibility as to the child's welfare' in subsection (b)
> includes all situations in which a parent's attempts at maintaining a reasonable

16

degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply."

*In re M.I.*, 2016 IL 120232, ¶ 26.

"Subsection (b) contains no state of mind requirement, nor does it carve out an exception for faultless failure." *Id.*

¶ 38    While respondent asserts that the multiple issues in his life caused him to "disappear" from DCFS's "radar," the record shows that he consistently failed to meaningfully participate in the service plan, engage in regular visitation with D.P., and remain in active communication with DCFS to correct the problems that brought D.P. into the system. Instead, for all but a few months, respondent was either incarcerated or his whereabouts were unknown during the pendency of this case. He only sought to reach out to DCFS once he was again in jail. He failed to attend any of the permanency hearings that were conducted when he was not in custody. Although respondent expressed some care and interest in D.P., the State proved by clear and convincing evidence that he failed to maintain a reasonable degree of concern and responsibility for D.P.'s welfare. Based upon our thorough review of the record, we conclude that the trial court's decision finding respondent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) was not against the manifest weight of the evidence.

¶ 39    However, even if this finding was in error, which we do not find, the trial court also found respondent unfit under section 1(D)(m) of the Adoption Act. *Id.* § 1(D)(m).

¶ 40    Under section 1(D)(m), the petition alleged that respondent failed:

"to make reasonable efforts to correct the conditions which were the basis for the removal of the child from them and/or have failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of

17

> neglect or abuse under the Juvenile Court Act, or after an adjudication of
>
> dependency under the Juvenile Court Act, and/or within any 9 month period after
>
> said finding."

See *id.*

¶ 41    The grounds for unfitness set forth in section 1(D)(m) of the Adoption Act are phrased in the disjunctive. *In re C.N.*, 196 Ill. 2d 181, 210 (2001). "Thus, section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." (Emphasis in original.) *Id.* at 210-11.

¶ 42    Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "The reasonable efforts inquiry is a subjective one, focusing on the efforts of the parent that would be reasonable for that parent under the circumstances." *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. "The inquiry is narrow, as it considers only the correction of those conditions originally providing the basis for removal of the children." *Id.*

¶ 43    "Whether a parent has made reasonable progress 'is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent.' " *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1067). Progress is considered in light of both the circumstances that gave rise to the original loss of custody as well as any other conditions that later become known. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57. At minimum, reasonable progress necessitates measurable or demonstrable movement toward the goal of reunification. *In re Je. A.*,

2019 IL App (1st) 190467, ¶ 62. Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.*

¶ 44    Termination under section 1(D)(m) contains a time frame limitation (750 ILCS 50/1(D)(m) (West 2020)), and thus in this section, we narrow our examination of respondent's progress towards reunification, including aspects such as his service plan and regularity of visitation, within the nine-month periods set forth by the State. Here, the basis for termination under ground (m) was during the nine-month period of March 20, 2022, through December 20, 2022. This period began after respondent was released from his initial incarceration and he was not in custody at any time during this nine-month period.

¶ 45    The reasonable efforts and reasonable progress grounds are based on respondent's actions to correct the conditions that led to the removal of D.P. from his care. Contrary to his argument, the record does not show that he made a reasonable effort or progress to reunify with D.P. Respondent does not address the reasonable efforts clause under section 1(D)(m)(i) (*id.* § 1(D)(m)(i)) in his opening brief and the State argues that respondent forfeited any challenge to the unfitness finding on this basis. In his reply brief, respondent contends that the State's evidence under ground (m) related only to the second prong of reasonable progress. The trial court's finding did not differentiate between the two prongs of ground (m) and referred to the lack of "significant effort" by either parent. Thus, to the extent that the court's found unfitness under section 1(D)(m)(i), respondent has forfeited any argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 46    However, even if respondent was correct that the State did not present sufficient evidence for the reasonable efforts prong, we find the State did present clear and convincing evidence to

support the unfitness finding for failure to make reasonable progress under section 1(D)(m)(ii) (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 47     As stated above, the relevant nine-month period is from March 20, 2022, through December 20, 2022. The service plans during this time period found respondent was "unsatisfactory" in his compliance with the plan. According to the April 2022 service plan, respondent was not engaged in any service upon his release from prison but was obtaining referrals to the required services. The exhibits presented at the hearing show that respondent received referrals for parenting classes, a substance abuse assessment, parent coaching, domestic violence, and individual therapy. However, the October 2022 service plan disclosed that respondent failed to engage in any of these recommended services and was again rated unsatisfactory. At that time, respondent's whereabouts were unknown. His last supervised visitation with D.P. had occurred in June or July 2022. Williamson was assigned the case in September 2022, and she went to multiple addresses and called several phone numbers in her attempts to locate respondent, but she was unsuccessful.

¶ 48     The April 2023 service plan, which included respondent's participation in services within the relevant time frame, continued to rate respondent as unsatisfactory in his compliance with the service plan. His whereabouts remained unknown and no visitation, calls, or contact with D.P. or the agency occurred. On December 20, 2022, the permanency goal was changed to the termination of parental rights.

¶ 49     As stated above, at minimum, reasonable progress necessitates measurable or demonstrable movement toward the goal of reunification. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. The evidence overwhelmingly established that respondent failed to make any progress toward reunification with D.P. While he received referrals, he failed to follow up and engage in

any of the recommended services within that nine-month period. Moreover, he disappeared and was unable to be located for approximately six months of this time period.

¶ 50    Respondent asserts that he "was in no position to perform the services recommended by the Agency, let alone make progress in reunifying with his child by performing the same until such date as the Agency had referred him to assigned service providers in June and July 2022." However, the record does not support this assertion. The DCFS referral form for parent training for respondent shows the requested start date of April 5, 2022, and was signed by the caseworker on April 5, 2022, and the supervisor on April 6, 2022. A referral form for a substance abuse assessment for respondent shows a requested start date of April 20, 2022, and was signed by the caseworker and the supervisor on April 20, 2022. A parent training/coaching referral form was made for respondent to begin April 26, 2022, and was signed by the caseworker and the supervisor on April 26, 2022. As demonstrated, respondent did receive referrals within a month of his release from custody, but he failed to engage in those services. Further, reasonable progress is an objective standard. "That respondent's personal circumstances prevented him from making reasonable progress is irrelevant to the ' "objective standard." ' " *Id.* ¶ 73 (quoting *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89, quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)).

¶ 51    Because respondent failed to make any progress toward the goal of reunification with D.P. during the relevant nine-month period between May 20, 2022, through December 20, 2022, we conclude that the trial court's finding of unfitness under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) was not against the manifest weight of the evidence.

¶ 52    Additionally, having thoroughly reviewed the record on appeal, we would also find that the trial court's finding of unfitness under ground (n) was not against the manifest weight of the evidence because the State presented clear and convincing evidence of respondent's intent to

forgo his parental rights manifested by his failure for a period of 12 months: "(i) to visit the child, (ii) to communicate with the child or agency, although able to do so and not prevented from doing so by an agency or by court order, or (iii) to maintain contact with or plan for the future of the child, although physically able to do so." *Id.* § 1(D)(n). Accordingly, we would also affirm on that basis.

¶ 53    Since we have concluded that the trial court's findings of unfitness under grounds (b), (m), and (n) were supported by clear and convincing evidence, and respondent has not challenged the court's best interest finding, the trial court's order terminating respondent's parental right to D.P. was not against the manifest weight of the evidence.

¶ 54    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 55    Affirmed.

---

***In re D.P.*, 2024 IL App (1st) 231530**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-959; the Hon. Patrick T. Murphy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jeffrey W. Gunn, of Tapia-Ruano & Gunn P.C., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Aaron J. Weiss, of counsel), guardian *ad litem*. |

---