NOTICE
Decision filed 06/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250753-U

NO. 5-25-0753

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF GIANNA T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Elizabeth G. and Marsha H., | ) | Macon County. |
| | ) | |
| Petitioners-Appellees, | ) | |
| | ) | |
| v. | ) | No. 25-AD-31 |
| | ) | |
| Jerad T., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's judgment terminating the respondent's parental rights was not against the manifest weight of the evidence. Pursuant to the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)), the petitioners—the natural mother and her aunt—showed that the respondent was an unfit parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2   The respondent, Jerad T. (Father), appeals from the January 16, 2026, order of the Macon County circuit court terminating his parental rights over his minor daughter. On appeal, Father challenges both the finding of unfitness and the determination that it was in the minor's best interest to terminate his parental rights. For the reasons explained below, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4      This case began on March 20, 2025, when Elizabeth G. (Mother) and Marsha H. (Marsha) (collectively, the petitioners) filed a petition for the adoption of the minor Gianna T., alleging that Father was an unfit parent pursuant to Illinois's Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)) because he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare for a period in excess of one year. Mother and Marsha are the minor's biological mother and maternal aunt,[1] respectively, and Father is her biological father.

¶ 5      The circuit court appointed a guardian *ad litem* (GAL) for the minor the following day. On June 13, 2025, the GAL filed a report stating that he had met with the petitioners and the four-year-old minor and confirmed the contents of the petition. He attested to the strong bond between the minor and the petitioners, and wrote that the minor currently resides with Mother in a "safe, pleasant" home. The GAL further observed that Father clearly had no involvement with the minor. The GAL recommended that the circuit court grant the petitioners' request to adopt the minor.

¶ 6                          A. Fitness Hearing

¶ 7      The circuit court held a fitness hearing on August 29, 2025. At the hearing, Mother testified that the minor had resided with her throughout the minor's life, and that she was the minor's primary caretaker. Mother stated that she and Father were not in a relationship when the minor was born, but about a month after she was born, they started dating and living together. They broke up in the spring of 2022, when the minor was approximately nine months old. At that point, Father also moved out of her home. For approximately the first two months after Father moved out, Mother and Father had an informal oral agreement that they would share parenting time, with

---

[1]Elizabeth G. is identified as Marsha H.'s niece, and Marsha, as Elizabeth's aunt. However, Marsha is also referred to in the record as the minor's aunt, and we adopt this identification for the sake of clarity.

2

Father having certain days of the week and every other weekend with the minor. The agreement fell apart approximately two months following that period. Mother and Father reached a new agreement under which Father had parenting time every other weekend. This lasted until October 2022.

¶ 8 Regarding the lapse in their agreement, Mother explained that during their first oral agreement, they began arguing, and Father would send her threatening texts and calls, asking her what she thought would happen to the minor if Mother were to die. Due to this behavior, as well as Mother's knowledge of her troubled past with Father, she eventually grew uncomfortable with allowing Father to pick the minor up from day care and taking her home with him. On one particular day, Mother told Father not to pick up the minor from day care, as she was going to do so. When Mother showed up at the day care, she learned that Father had indeed picked the minor up. Mother further testified that she was unable to reach Father by phone, and eventually called his then-wife, who was able to get ahold of him. Father refused to return the minor to Mother. Mother was able to get the minor back after she involved the county sheriff. Mother added that she got an order of protection against Father the following day, and included the minor as a protected party.

¶ 9 Mother testified that she started allowing Father to see the minor again on the advice of her attorney, who she retained after Father indicated that he would take her to court. However, Mother stated that there were issues with Father not paying for the minor's day care and failing to pick her up. Mother and Father also continued to argue with each other. In October 2022, Mother ended Father's parenting time, telling him that the agreement was not working, and they should involve the court.

3

¶ 10　　Mother further testified that Father had issues with substance abuse and alcohol in the past, and he had been violent in the presence of Mother's older daughter when the child was three. Father was taken into custody in October 2023 and was sentenced to 17 years in the Illinois Department of Corrections in May 2024. Mother stated that Father has made no effort to see, communicate with, or provide assistance for the minor since October 2022. He never sent holiday or birthday cards, and never contacted Mother in any way regarding the minor.

¶ 11　　On cross-examination, Mother acknowledged that, for the approximately seven months that she and Father were living together, Father participated in caretaking responsibilities relating to the minor. After he moved out, Mother recalled that he was paying for half of the minor's day care expenses. Regarding the order of protection that Mother sought against Father following the day care incident, Mother stated that the emergency order was granted, but that she did not seek a plenary order of protection. Mother presented no further evidence or testimony.

¶ 12　　Father testified on his own behalf that he was present at the minor's birth and signed her birth certificate. He was living in Texas at the time, and would stay with Mother when he visited her, until he moved in with her after the minor was born. Father said that he and Mother were in a relationship at the time of the minor's birth, and were trying to reconcile. He estimated that he lived with Mother and the minor for approximately nine months. Mother's older daughter also lived with them, and Father described his relationship with her as "great," saying she called him "Daddy Jerad." He said that he assisted with the caretaking of both minors, while working full-time.

¶ 13　　Regarding the break-up, Father said that Mother "just kind of shut off," so they parted ways. Father moved out and eventually married someone else. He acknowledged the verbal agreement between himself and Mother to split parenting time approximately equally. In addition

4

to paying for half of the day care expenses, Father stated that he paid Mother directly for the minor's care on a few occasions. Father testified that the minor was frequently sick, and he would have to take her to the hospital and care for her until she got better, before handing her off to Mother. He said that he and Mother disagreed about the day care—Father did not want her going there because she kept getting sick, but it was more convenient for Mother's work commute. Father also said that they would argue because Mother did not want him to make decisions regarding the minor when she was in the hospital.

¶ 14    When Mother told him not to pick the minor up from day care, Father disagreed, and testified that he went to pick her up because he felt entitled to his usual visitation with her. He denied any intent to keep her longer than the agreed-upon time. Father also denied ever arguing with Mother in front of the minor, saying that he would go into another room when he would call Mother so that he did not scare the minor when he raised his voice. Regarding what happened in October 2022 that caused Mother to terminate Father's visitation with the minor, Father stated that Mother asked him for the money that he was paying her every two weeks for the minor's care. Father told her that he had it, but it was on his wife's phone, but she was sleeping and pregnant, and Father did not want to wake her. He promised Mother that he would send the money when his wife woke up, but Mother instead told him that she was "done," and he could take her to court. Father said he tried calling her after that, and continued to promise that he would send the money, but Mother withheld his visits ever since that incident.

¶ 15    Father also acknowledged that he incurred a domestic violence charge stemming from his snatching a cellphone out of the hands of his wife's daughter, but that was not the reason he ended up in custody. Father denied ever engaging in drug or alcohol use in the presence of Mother's older daughter, but said he was taking the drug and alcohol classes offered by the facility in which he

5

was incarcerated. He said he had not received any updates about the minor since October 2022, despite texting Mother numerous times and leaving voicemails on her phone. He denied that any of his communication was threatening, and said that he even asked his wife for assistance in wording his messages to Mother, so that he did not make the situation worse by irritating her. Father further stated that his wife also tried communicating with Mother, but Mother eventually stopped responding to her. Father said that he bought presents for the minor's birthday and Christmas, but was never able to get them to her.

¶ 16    On cross-examination, Father acknowledged that he was incarcerated because he held his pregnant wife[2] at gunpoint after conducting a home invasion, which led to a five-hour standoff with police. When asked if he ever went to court to try to see the minor, as Mother had told him, he said that he did, once he was able to save up the money to hire an attorney. Father was also asked why he did not show up to any hearings after firing his attorney, to which he said that he was trying to find a new attorney. He acknowledged that it was his responsibility to attend court dates, but denied ever receiving notice of those dates.

¶ 17    Next, Diane D. (Diane), Father's mother, testified on behalf of Father. Diane stated that she loved the minor, and the minor would spend the night with her on occasion. She also said that Father loved her, and brought her everywhere with him. She described him as an excellent father who loved all of his kids.[3] Diane said that the last time she saw the minor was approximately two and a half years ago, and she was afraid that Mother would have her arrested if she tried to see the minor after that time. On cross-examination, Diane said that she had noticed that the minor was

---

[2]At the time of the hearing, Father had divorced his wife.
[3]Father also had two sons, not with Mother.

often sick, and she knew that Father would tell Mother that she needed to take the minor to a better doctor.

¶ 18    On redirect, Mother was recalled and testified that the minor had recurring ear infections for the first two years of her life, and Mother took her to the hospital to have tubes put in her ears. Mother further indicated that the minor no longer has chronic ear infections, as she has outgrown the condition and the tubes have been removed. Further, the minor no longer attends the specific day care, as she is in preschool. Mother also said that she took the minor to all of her medical appointments, including annual checkups, and made sure she was current on her immunizations. Apart from the ear surgery, Mother testified that the minor was never hospitalized. She also stated that the minor was not prescribed any medications at present, and the last time she was sick was approximately a year ago. Mother also denied that the minor had any unexplained recurring injuries while she was attending day care, and she never had any concerns about any of the staff there.

¶ 19    Regarding the October 2022 incident to which Father testified, where Mother withheld his parenting time because he did not pay her, Mother explained that this nonpayment was "the last straw," as he had failed to make timely payments to the day care in the past, and there were times when the minor was going to be kicked out. There were also times when he failed to pick the minor up from day care. Mother reiterated that Father was threatening her, saying that he would take the minor, and that he would get the minor if Mother died.

¶ 20    Following witness testimony, counsel for the petitioners argued that, even excluding the time that Father spent in custody, there was a full year in which Father failed to demonstrate any interest in the minor. From October 2022 to October 2023, he did not provide any financial support for the minor. He retained counsel in early 2023, but his attorney withdrew. For the several months

7

that he was *pro se*, he did nothing to follow through with the case, which could have resulted in his being awarded parenting time. Father also did not present any evidence of text messages, call logs, Facebook messages, or any other proof that he attempted to communicate with the minor or inquire into her well-being. Mother's counsel also noted that Father blamed everyone but himself for his situation. Lastly, counsel asked the circuit court to take judicial notice of the criminal case resulting in Father's October 2023 arrest and present incarceration, stemming from an incident in which he held his pregnant wife at gunpoint and was in an hours-long standoff with police.

¶ 21 Counsel for Father argued that he followed Mother from Texas to Illinois when the minor was born, was trying to reconcile with Mother, and signed the minor's birth certificate, indicating his strong desire to be a part of the minor's life. He lived with Mother, and they were functioning as a family unit until spring 2022, at which time he and Mother were able to work out a coparenting arrangement. Father also shared day care costs. Father became concerned about the minor's health and spent a lot of time taking her to the emergency room. This caused friction in the coparenting situation. Counsel argued that Father's lack of contact with the minor after October 2022 was a sign that Father was respecting Mother's wishes that he have no further involvement with the minor, although he tried to reach out to Mother to ask about the minor. He also asked his then-wife for assistance drafting messages to Mother, so that he would not come off aggressive and anger her.

¶ 22 Counsel for Father further argued that he managed to save up money to hire an attorney and pursue his parental rights in court, and only missed hearings because he did not know how to proceed in the case without an attorney. Counsel asked the court to view Father's actions in light of his turbulent circumstances, from the breakdown of his relationship with Mother, to his ending up in custody, cutting off his options for trying to maintain a connection with the minor.

¶ 23    The circuit court stated that it found Mother to be a credible witness and Father not to be a credible witness. The court noted Mother's testimony that she stopped Father's visits because he threatened her, and because he missed pick-ups from and payments to the day care. She told him to go through family court if he wanted parenting time, which he did in early 2023. However, according to his testimony, he fired his attorney, and then failed to appear at court dates despite receiving notice. He also did not hire new counsel. Thus, the court concluded, Father knew what he had to do to get parenting time, but he failed to go forward with the family court proceedings.

¶ 24    The court continued, stating that Father had not provided any financial support for the minor in any way since October 2022, and had not sent cards. He testified that he wanted a relationship with her and loved her, but "failed to act on his feelings." The court found that Father "stopped trying to have a relationship with his daughter," and his testimony was replete with excuses. The circuit court further expressed concern about the serious charges in Father's criminal case. The circuit court thus found that petitioners had proven by clear and convincing evidence that Father was an unfit parent because he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare for over a year.

¶ 25                            B. Best-Interest Hearing

¶ 26    The circuit court held a best-interest hearing on September 12, 2025. Mother testified that she had been solely responsible for the minor's care and upbringing—financially, emotionally, and in every other manner—since Father was taken into custody. She also described Marsha's relationship to the minor, saying that Marsha lived across from Mother and saw the minor at least weekly. She was the minor's primary babysitter. Marsha also spent holidays with Mother and the minor, and they participated in family dinners and other activities together. The minor regularly

9

stayed with Marsha overnight. The minor was exceedingly familiar with Marsha and felt love and attachment from her. Marsha was very involved in her life.

¶ 27    Mother further stated that Marsha and her husband had four children, and three of those were foster children who Marsha and her husband had adopted. To her knowledge, Marsha and her husband had no criminal records, had never been investigated by the Department of Children and Family Services, were both employed, were in good health, and were kind, loving, and helpful people. Mother believed that if Father's parental rights were terminated and something were to happen to her, Marsha would adopt the minor and take very good care of her.

¶ 28    Marsha then testified, stating that she was 58 years old and she agreed with Mother's testimony regarding herself and the minor. She said she understood what her responsibilities would be if the court terminated Father's parental rights. Marsha described her relationship with the minor, stating that her family had dinners together with Mother's family, and the minor participated in other activities with her family as well, including swimming in their pool. Marsha also tried to teach the minor about being a good person, politeness, and good manners.

¶ 29    Marsha's four children were all out of the home, and they did not rely on her for financial support. Marsha testified that she and her husband were able to financially support the minor. Marsha also stated that she intended to allow Mother to be the minor's primary parent, and would stay out of her way unless something were to happen to her. If Mother were unable to parent the minor, Marsha was prepared to step in.

¶ 30    Counsel for the petitioners waived argument. Counsel for Father stated that it was important for the minor to maintain her legal connection to Father, and should have the opportunity to pursue a relationship with him when she was older, if she so desired. The GAL then told the circuit court that he had met with the petitioners at Marsha's home, and he believed that the minor

would be in a "very pleasant household" in both petitioners' homes. He therefore recommended that the court grant the petition.

¶ 31 The circuit court stated that it had considered the best-interest factors, and found that the minor was currently physically safe and doing well in Mother's custody. Marsha was also very close with the minor and the testimony showed that the minor felt a sense of attachment to both petitioners. The petitioners also shared a family connection to the minor. Adoption would allow the minor to continue living as she previously had been, whereas she had not seen Father since October 2022. The court added that Father was currently incarcerated and would remain so for some time. The court thus found that it was in the best interest of the minor that Father's parental rights be terminated. The judgment as to parental fitness and permanent termination of Father's parental rights was entered on January 16, 2026. Father indicated his intent to appeal, so the court noted it would wait to enter a final adoption order. This appeal followed.[4]

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, Father argues that the circuit court's findings that he was an unfit parent and that termination of his parental rights was in the minor's best interest were against the manifest weight of the evidence. We reject both contentions.

¶ 34                  A. The Circuit Court's Finding of Unfitness

¶ 35 Before a minor may be adopted, the minor's natural parents or guardian must either consent to the adoption or be found unfit by the court pursuant to section 1(D) of the Adoption Act. *In re Adoption of Syck*, 138 Ill. 2d 255, 259 (1990); *Douglas R.S. v. Jennifer A.S.*, 2012 IL App (5th) 110321, ¶ 3; 750 ILCS 50/1(D) (West 2024). The parties petitioning for the minor's adoption must

---

[4]Father filed his notice of appeal on September 18, 2025. However, the circuit court's judgment terminating his parental rights was not entered until January 16, 2026. As such, we treat Father's notice of appeal as being filed on that date as well. See Ill. S. Ct. R. 606(b) (eff. Jan. 1, 2026).

first prove parental unfitness by clear and convincing evidence. *Syck*, 138 Ill. 2d at 273-74. At the unfitness stage, the focus is solely on the conduct of the parent. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5. If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *Id.*

¶ 36    As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
> (b) Failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024).

¶ 37    A finding of unfitness under subsection (D)(b) of this provision is based on a subjective analysis, which focuses not on the parent's success, but rather on the reasonableness of his or her efforts, taking into account his or her particular difficulties and circumstances. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating some interest in or affection towards the child does not render a parent fit under this subsection; rather, the parent's interest, concern, and/or responsibility must be reasonable. *Id.* Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *Id.* Unlike subsection (D)(m), subsection (D)(b) has no time constraint that limits our consideration of Father's fitness. *Id.* Infrequent or irregular visitation with the child has been held to be sufficient evidence warranting a finding of unfitness under this subsection. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 38    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned

to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 39 On appeal, Father acknowledges that he failed to visit or communicate with the minor since October 2022. However, he argues that his failure was not his fault, in light of the circumstances. Specifically, he contends that Mother unilaterally cut him off from visiting and communicating with the minor, a decision that he fought through repeated efforts to contact Mother and through the family court case. He further contends that he continued to send Mother voluntary child support payments until his incarceration in October 2023, and when he was unable to send his usual amount of money, Mother completely cut off his access to the minor. He continues, stating that, after he was incarcerated and no longer able to financially support her, he still tried to contact Mother and inquire after the minor's well-being. However, Mother denied his efforts. Thus, Father concludes that he made consistent efforts to maintain his interest, concern, and responsibility regarding the minor, but was thwarted at every attempt by Mother.

¶ 40 As a preliminary matter, we note that no appellee briefs were filed in the instant appeal. In the absence of an appellee's brief, a reviewing court has three discretionary options it may exercise:

> "(1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record." *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009) (citing *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976)).

In the instant case, the record is simple and the issues may be decided without the aid of an appellee's brief. *In re Adoption of V.C.*, 2024 IL App (2d) 230275, ¶ 14.

13

¶ 41    We find that the record on appeal does not support Father's position that the circuit court's unfitness ruling was against the manifest weight of the evidence. Firstly, we note that we will not disturb the circuit court's credibility determinations and the weight it gave to conflicting testimony. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Here, the court determined that Mother's testimony was credible, and Father's was not. The circuit court also noted that Father failed to support his assertions that he made concerted efforts to contact Mother and/or the minor. He did not submit evidence of any of the alleged calls, texts, messages, and cards that he claims to have sent. In addition to the lack of evidence that he tried to communicate with or inquire after the minor, there was no evidence to counter Mother's testimony that any calls or texts he did make were threatening in nature.

¶ 42    Next, the circuit court considered Father's efforts in pursuing parenting time through family court. Father testified that he "fired" his attorney, implying that it was his choice to proceed without counsel. Father was aware of the family court matter, and received notice of hearing dates. His *pro se* status did not excuse his failure to comply with court rules. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. He neither made any effort to pursue the matter *pro se* nor retained new counsel. Thus, the evidence relating to the family law case supported the circuit court's unfitness finding.

¶ 43    The circuit court also considered the circumstances of Father's incarceration, and disagreed with Father's contention that this was something out of his control that prevented him from further contact with the minor. Rather, the court noted that Father made many excuses for his own failings. Father's own actions landed him in custody, just as his actions impacted Mother's decision to limit his parenting time. Despite his contentions on appeal, the circuit court found that he did not provide the financial assistance he claims to have paid Mother. He missed payment dates for the minor's

14

day care and failed to pick her up on occasion. Mother testified that he threatened her and had a history of verbal and physical aggression. Additionally, there was testimony regarding Father's substance abuse.

¶ 44    In summary, the record on appeal shows that the circuit court's unfitness determination was not against the manifest weight of the evidence. Furthermore, Father provides no basis on appeal to disturb the circuit court's findings.

¶ 45                    B. The Circuit Court's Best-Interest Finding

¶ 46    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the petitioner bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5; *Harold K. v. Ryan B.*, 313 Ill. App. 3d 692, 699 (2000) ("In an adoption setting, the trial court must base its decision 'on the welfare and best interests of the child.' 750 ILCS 50/15.1(c) (West 1994).").

¶ 47    In making a best-interest determination, the court must consider all relevant factors, including, but not limited to, the following factors listed in section 15.1 of the Adoption Act:

> "(1) the wishes of the child;
>
> (2) the interaction and interrelationship of the child with the applicant to adopt the child;
>
> (3) the child's need for stability and continuity of relationship with parent figures;
>
> (4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;

(5) the child's adjustment to the child's present home, school and community;

(6) the mental and physical health of all individuals involved;

(7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;

(8) the background, age and living arrangements of the applicant to adopt the child;

(9) the criminal background check report presented to the court as part of the investigation required under Section 6 of this Act." 750 ILCS 50/15.1(b) (West 2024).

*In re Adoption of C.D.*, 313 Ill. App. 3d 301, 307-08 (2000).

¶ 48    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 49    On appeal, Father argues that there was insufficient evidence presented regarding the best-interest factors for the circuit court to determine by a preponderance of the evidence that terminating his parental rights was in the minor's best interest. He challenges the GAL report for the GAL's failure to speak with Father and its conclusion that the minor was in a safe home and bonded with the petitioners. He also argues that none of Mother's claims were supported by evidence and were merely expressions of her "clear distain" for Father. Father further contends that Marsha's testimony only added that she was prepared to be a "back-up parent if one became necessary," rather than establishing that she intended to fulfill a parental role in the minor's life.

¶ 50    Before proceeding with a summary of Father's specific contentions relating to the best-interest factors, we note that in his argument on appeal, Father refers to the statutory best-interest factors found in section 1-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-3(4.05) (West 2024)), which are applicable to a court's best-interest determination upon the

16

State's filing of a petition to terminate parental rights. While the language used in that section and section 15.1 of the Adoption Act is not identical, the factors are substantively similar, and the Adoption Act allows the court to review other relevant factors beyond those listed in section 15.1. Furthermore, our supreme court in *In re M.M.*, 156 Ill. 2d 53, 67 (1993), explained as follows:

> "Obviously, best interests considerations under the Juvenile Court Act and the Adoption Act are not mutually exclusive. However, the juvenile court's best interests considerations, in the context of a termination proceeding, are limited to a determination of whether it is in the child's best interests to be freed for adoption. By contrast, best interests considerations in the context of an adoption proceeding concern the appropriateness of a particular adoption placement."

¶ 51    We find that, regardless of the language used, the record here does not contain evidence indicating that an adoption placement with Mother and Marsha would be inappropriate. We therefore preserve the language Father uses in his appellant brief, but make our determination regarding the circuit court's best-interest finding pursuant to the Adoption Act. See also 750 ILCS 50/2.1 (West 2024) ("This Act shall be construed in concert with the Juvenile Court Act of 1987 ***."); *In re A.S.B.*, 381 Ill. App. 3d 220, 221-22 (2008) (stating that, in cases under the Juvenile Court Act or the Adoption Act, "the goals of the termination proceedings are the same: (1) to determine whether the natural parents are unfit and if so (2) to determine whether adoption is in the child's best interests").

¶ 52    Addressing the specific best-interest factors, Father admits that the physical safety and well-being of the minor favors terminating Father's parental rights. He argues that the minor developed her identity with both parents, and it was only due to Mother's efforts to deprive him of parenting time that he was not able to be present with the minor past the first year and a half of her life. Regarding the minor's familial ties, Father argues that Mother would prevent her from having any contact with him and his side of the family, although he concedes that this and the previous factor do not hold much weight given the minor's young age.

¶ 53   Father states that the factor of the minor's sense of attachments and least disruptive placement should weigh equally for both sides, as there was no evidence presented to dispute Father's assertion that he loved and cared for the minor. The minor was too young to express her wishes, and so Father does not argue that this factor favors either side. He also contends that the community ties factor favors neither party, stating that there was no evidence presented on this point. Father admits that the minor has permanence with the petitioners, but argues that she had permanence with Father before Mother cut off his parenting time.

¶ 54   As for the uniqueness of every family and child, Father argues that this factor falls in his favor because the only reason that he was at risk of losing his parental rights was because of Mother's efforts to "destroy his relationship with his daughter." As the minor is not at risk of entering substitute care, Father does not allege that this factor favors either party. Lastly, Father admits that the preferences of the persons available to care for the minor falls in the petitioners' favor, as Father is currently incarcerated and unable to care for her.

¶ 55   We disagree with Father that the circuit court lacked sufficient evidence to make a best-interest finding by a preponderance of the evidence, or that the court failed to adequately consider the statutory factors. Even in Father's own argument on appeal, he acknowledges that the balance of the factors falls in favor of terminating his parental rights. He is correct that he is unable to care for the minor while incarcerated, that the minor has spent the majority of her life living with Mother, and under Mother's care, and that the minor has strong attachments to the petitioners. At the best-interest hearing, the circuit court also heard testimony from both petitioners regarding Marsha's relationship with the minor, as well as the GAL's report and recommendation that both petitioners' homes would provide a safe and loving environment for the minor.

18

¶ 56    Regarding Father's repeated assertions that it is only due to Mother's actions that some of the best-interest factors do not favor him more strongly, we find that this is contrary to the record on appeal. As the circuit court noted in its unfitness finding, Father made many excuses for his shortcomings as a parent, when the responsibility lay with him. As we discussed in the previous section, Father's characterization of the facts presented is inaccurate where he suggests that Mother was solely to blame for his loss of parenting time. By the time of the best-interest hearing, the minor was experiencing stability, safety, affection, and permanence living with the petitioners. By contrast, she had not seen or heard from Father since she was approximately one and a half years old. Moreover, Father demonstrated that he could not reliably financially support her, and he was incarcerated.

¶ 57    While we do not dispute Father's assertion that he loves his daughter, that is not the appropriate question at the best-interest stage. *In re D.T.*, 212 Ill. 2d at 364. In light of the testimony presented at the best-interest hearing, we agree with the circuit court that the State met its burden of proving by a preponderance of the evidence that it was in the minor's best interest to terminate Father's parental rights. We further find that the circuit court's determination was not against the manifest weight of the evidence, where the evidence strongly supported a finding that the relevant statutory factors came out in favor of termination.

¶ 58                                III. CONCLUSION

¶ 59    For the reasons stated, the circuit court did not err in terminating the respondent's parental rights to the minor. The judgment of the circuit court is affirmed.


¶ 60    Affirmed.

19