NOTICE
Decision filed 12/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250632-U

NOS. 5-25-0632, 5-25-0633 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* CASHMERE T. and FINEST T., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-JA-141, 22-JA-142 |
| | ) | |
| Robert C., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment terminating respondent's parental rights was not against the manifest weight of the evidence where the State met its burdens of proving that respondent was unfit to parent and that termination was in the best interest of the minors. Therefore, the judgment of the circuit court is affirmed.

¶ 2    Respondent, Robert C., appeals from the August 5, 2025, judgment of the circuit court terminating his parental rights over his two minor children. On appeal, respondent challenges both the finding of unfitness and the determination that it was in the minors' best interests to terminate his parental rights. For the reasons explained below, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On July 1, 2022, the State filed petitions for adjudication of wardship for Cashmere T. and Finest T. in the two underlying cases, identifying respondent as their father. The State argued that the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) because their home environment was injurious to their welfare due to the presence of substance abuse and domestic violence occurring between respondent and his girlfriend. The State further argued that the minors were abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2022)) based on the same allegations of substance abuse and domestic violence, which "create[d] a substantial risk of physical injury *** by other than accidental means" to the minors. The petitions indicated that the mother's location was unknown. The circuit court entered a temporary custody order the same day.

¶ 5                                 A. Initial Proceedings

¶ 6     The Department of Children and Family Services (DCFS) filed a shelter care report on behalf of the two minors on July 1, 2022. The report indicated that law enforcement responded to a wellness check at respondent's home on June 25, 2022, which resulted in his arrest for domestic battery and endangering the life and health of a child. It was reported that respondent beat his girlfriend and then went out drinking. His girlfriend declined to press charges, but she told law enforcement that the domestic violence was "an ongoing thing." She also explained that she and respondent lived in the home with his two children, over whom he had recently obtained guardianship.

¶ 7     Law enforcement came to the home to check on the children four days later. DCFS took custody of the two minors, Cashmere, born June 2011, and Finest, born May 2013, because they were present in the home during the domestic dispute and were then left alone while respondent

2

and his girlfriend went out drinking. Both children confirmed these events when they spoke with law enforcement, adding that they were left alone for four days, until their father was released from jail. The children further stated that they had witnessed other domestic violence incidents in the home in the past. The report also indicated that respondent was recommended to complete the following services: substance abuse, domestic violence, anger management, and parenting.

¶ 8    The circuit court entered adjudicatory orders in both minors' cases on October 19, 2022. The court found the minors to be abused and neglected due to a home environment injurious to their welfare and a substantial risk of physical abuse pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act, respectively. On that same day, the court entered dispositional orders making the minors wards of the court, granting guardianship to DCFS, and setting the matter for a permanency hearing.

¶ 9    The circuit court entered a permanency order on February 8, 2023, indicating that the goal was for the minors to be returned home within 12 months. The goal was selected because, as the court noted, respondent had "engaged in some services." However, the court found that respondent had not made reasonable and sustained progress or reasonable efforts towards the return of the minors, as he had not begun all required services.

¶ 10    DCFS filed another permanency review report on July 13, 2023. Respondent was unsuccessfully discharged from parenting services due to lack of contact. He was re-referred in June 2023, and after some failed attempts by his new parenting instructor to reach him, he was scheduled to restart services later that July. He was rated unsatisfactory for parenting services. Regarding substance abuse services, respondent failed to appear for any drug screens, and his caseworker was unable to reach him consistently during the latest reporting period.

3

¶ 11    Respondent had stopped attending therapy and was unsuccessfully discharged from mental health services. He also had yet to engage in domestic violence services. Regarding maintaining personal stability, he was rated unsatisfactory because his caseworker could not consistently reach him. He was also arrested in February 2023 for failing to appear in court on his domestic battery charges. DCFS further noted that he had two active warrants in Wisconsin; he was extradited to that state and released on a bond, after which he returned to Illinois. DCFS presented respondent with a copy of his current service plan while he was in jail, but he refused to sign it.

¶ 12    On visitation, DCFS's report noted that respondent's then-caseworker asked to be removed from his case in March 2023 because he was "very irate and hostile with her" during a visit. Respondent was assigned a new caseworker, who was only able to report on one visit, which he said went well. The caseworker also reported that respondent told him he drinks beer occasionally; the caseworker did not see a lot of alcohol when he visited the home. The report also stated that, in addition to correcting his poor engagement in services, respondent "needed to demonstrate accountability and an understanding of why his children came to care in order to effectively progress in services rather than just 'go through the motion' of these services."

¶ 13    The State filed motions seeking a finding of unfitness and the permanent termination of respondent's parental rights as to both minors on July 25, 2023. In its motions, the State alleged that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the two minors' welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)); failed to make reasonable efforts to correct the conditions forming the basis for the minors' removal during any nine-month period following the adjudication of neglect/abuse pursuant to section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2022)); and failed to make reasonable progress towards the return of the minors during any post adjudication

4

nine-month period pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)). The State identified the relevant nine-month period for the latter two allegations as October 19, 2022, through July 19, 2023.

¶ 14 The circuit court held a fitness hearing on November 2, 2023, at which it found respondent to be an unfit parent on all three bases raised in the State's motion. The best-interest hearing took place on November 20, 2023. The circuit court found that the State had failed to prove by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of the minors.[1] The permanency goal remained return home within 12 months.

¶ 15 The State filed a second set of motions for termination of respondent's parental rights over the minors on January 23, 2025, on the same three bases as its prior motions. The State alleged new nine-month periods for its claims that respondent failed to make reasonable efforts or progress towards the return of the minors: (1) from November 21, 2023, to August 21, 2024; and (2) from April 23, 2024, to January 23, 2025. The circuit court held a new fitness hearing on these motions on April 28, 2025, at which it took judicial notice of the rulings in the prior unfitness and best-interest hearings.

¶ 16                      B. Fitness Hearing

¶ 17 DCFS child welfare specialist Mykaile Warfield testified for the State. She explained that she had been assigned to the two minors since the start of the case in 2022, and in November 2023, respondent still needed to complete parenting education, mental health services, drug screens, and domestic violence services, and still needed to show personal stability. She stated that he restarted parenting services that month following a two-month gap, and when he resumed, he was engaged and "completely prepared"; he successfully completed parenting services in March 2024. Warfield

---

[1]The circuit court also terminated by default the parental rights of the minors' mother at this time.

stated that a parent who is making reasonable efforts would typically complete a parenting program in 14 to 16 weeks.

¶ 18    Warfield further testified that DCFS had concerns regarding respondent's visitation and contact with the children. The older child had previously told a caseworker that respondent had asked him to lie on respondent's behalf and tell his foster parents that DCFS was trying to prevent his return home. Respondent had also secretly given the minors a cellphone, on which he contacted them without agency supervision, in violation of the terms of his visitation. Warfield explained that respondent's calls with the minors were to be supervised due to past issues with them discussing the minors' return home. She added that the minors' foster mother had reported that it was emotionally difficult for them to discuss going home and then being told they could not; she said she could see their disappointment and confusion.

¶ 19    Warfield also described a 2024 incident in which DCFS became aware that respondent had asked his older son, who was 13 at the time of the hearing, to lie on his behalf and say that Warfield threatened to do "everything in [her] power for [the minors] not to come home." The minor apologized and admitted that respondent had told him to say this. Both children were also diagnosed with autism, and Warfield explained that they had difficulties grappling with subtleties and a lack of routine. When respondent would tell them that they were coming home soon, they believed him. However, beyond those issues, Warfield stated that visitation went well, there were no safety concerns, and respondent and the minors clearly shared a close bond. Respondent occasionally missed visits, but these were due to work or a death in the family, and it was not enough to warrant an unsatisfactory rating.

¶ 20    Regarding domestic violence services, respondent started making progress in December 2024 and successfully completed these services that same month. However, Warfield added that

6

he was supposed to begin in February 2024, which he did not do. He was also almost dropped from the program in August 2024, when he became irate during a session, scaring the instructor and prompting her to end the group early. The instructor reported that they generally discharge people after such incidents, but respondent apologized afterwards and was able to continue the program. Warfield explained that respondent's domestic violence program could be completed in between two to six months.

¶ 21 Warfield testified that respondent previously underwent a substance abuse assessment and was not recommended for further services; however, due to the incident at the start of this case, he was required to attend drug screens. Respondent had not completed any random drug screens since the case was opened, including missing 16 in 2024. While she did not know how many he missed in 2025, she explained that he would have been asked to appear for testing once or twice per month, and he had not appeared for any screens that year.

¶ 22 Warfield explained that because DCFS was often unable to contact respondent, he was put on a system where he was given a contact number to call daily and learn whether he was scheduled for testing. DCFS sent respondent a letter informing him of this process and of what he would have to do, and Warfield added that she mailed this letter to him "several times," as well as texting him the information, at his request. She stated that he mentioned during a meeting that he had thought DCFS would call him; he was then reminded that it was his responsibility to call the provided number daily and attend any screens.

¶ 23 Regarding mental health, Warfield testified that she re-referred respondent after he was unsuccessfully discharged from services. A provider became available for him in November 2024, but since he had previously been unsuccessfully discharged, he was required to attend a reengagement meeting prior to restarting services. He was scheduled for a meeting in January

2025, and Warfield said she texted him a reminder and asked him to confirm receipt. He did not respond, and did not attend the meeting. After not hearing from him for 30 days, the provider unsuccessfully discharged him. Warfield added that respondent stated he had been receiving services from another provider, as well as mentorship and counseling through a church, but he was unable to provide confirmation of either. DCFS also had difficulty arranging mental health services for respondent due to an inability to contact him by phone or mail for some time.

¶ 24    Concerning respondent's communication with DCFS in general, Warfield testified that she was sometimes able to reach him by phone or text, but other times, she could not. She had a list of several contact numbers for him that did not work, which she explained was because he would change his number. Warfield also showed up unannounced at his residence to try to catch him at home and remind him of his recommended services and his responsibility to update DCFS on any changes in contact information. However, she was unsuccessful. She additionally tried contacting him by mailing letters to his address but received no response. None of the letters were returned as undeliverable. Warfield stated that she believed respondent did receive them, because none were returned as undeliverable, and because he once mentioned an upcoming team meeting that he would only have learned about through one of her letters.

¶ 25    Regarding personal stability, Warfield testified that she conducted a home safety check in August 2024, at which she also reminded respondent of the need to attend drug screens. Due to his inconsistent contact with DCFS, no home inspection had been done since a follow-up visit in October 2024, and DCFS could not confirm whether respondent currently lived at the same address. In December 2023, respondent told DCFS that he was employed, but he never provided proof of that employment. Respondent's lack of communication also impacted his visitation—the worker currently assigned to supervise his visits was unable to contact him to schedule any visits.

8

¶ 26 Overall, respondent had not been rated satisfactory on his service plan since the circuit court set the present permanency goal in November 2023. Warfield further stated that, as of the hearing, DCFS would not be able to return the minors to respondent's home, due to his failure to complete all parts of his service plan. She added that DCFS currently could not determine where respondent stood regarding substance abuse and/or sobriety, or what mental health or substance abuse services he would ultimately need to complete. This was particularly important in light of the inciting incident for this case.

¶ 27 Respondent next testified, confirming that he had indeed received DCFS's drug screen notifications. Regarding his failures to attend, respondent said he was not from the area and was out of town a lot. He also stated that he did not have a substance abuse problem and, when he took a substance abuse assessment, he was told he did not require any further treatment. He said he also attended approximately 25 therapy sessions and was diagnosed with severe depression. He denied being unsuccessfully discharged from mental health services because there was no set ending point for therapy; additionally, he tried to restart therapy after falling off in attendance, but he was placed on a long waiting list and could not get treatment as soon as he wished. He also stated that Warfield told him not to continue with the provider he had been seeing and instead told him to "go to the one she wanted [him] to go to." On cross-examination, he said that he started attending mental health services around mid-2023, and stopped engaging around late 2023 or early 2024, when he had a self-described mental breakdown.

¶ 28 Respondent denied telling his son to lie to his foster parents about Warfield, saying that he told his children not to lie, and that his children were scared of Warfield because she was angry and rude to them. He also testified that he was no longer working for the employer he identified to DCFS and admitted that he never provided DCFS with proof of that employment. He stated that

9

he was currently working as a self-employed contractor. Respondent further testified that he did change phone numbers quite frequently over the course of the case but attributed it to breaking old phones or otherwise buying new ones. He also stated that he always informed Warfield of changes to his phone number and clarified on cross-examination that he only changed phone numbers two or three times over the course of the case.

¶ 29    Addressing the incident during his domestic violence course, respondent denied that he had an "outburst" or behaved aggressively, stating that he was actually crying and experiencing a lot of emotions and confusion around losing his children. He added that he had stood up at some point during this release of emotions, and this was misconstrued as aggression, when he was actually just getting up to leave at the end of the session.

¶ 30    Warfield was re-called. In her continued testimony, she stated that DCFS did not have any documentation or other evidence indicating that respondent was engaging in mental health services from his own choice of provider after March 2023. After DCFS referred him to services later that year, Warfield stated that she received a call from his assigned counselor in October 2023 saying that he failed to come in for his appointment, and the reason he gave was that he could not find the location. He was again referred to services and assigned a counselor in February 2024, but failed to engage, and was unsuccessfully discharged.

¶ 31    Following arguments, the circuit court ruled that the State had shown by clear and convincing evidence that respondent was unfit due to: (a) a failure to maintain a reasonable degree of interest, concern, or responsibility regarding the minors; (b) a failure to make reasonable efforts towards correcting the conditions leading to the minors' removal; and (c) a failure to make reasonable progress towards the return home of the minors.

¶ 32   Addressing the first of the State's bases for termination, the court explained that the evidence regarding respondent's visitation would not, on its own, warrant an unfitness finding. However, the court considered that evidence alongside respondent's failure to comply with his service plan, as evidenced by repeated unsatisfactory ratings, unsatisfactory discharge from counseling, and failure to appear for various evaluations and drug screens. The court explained that a failure to complete services indicated a lack of interest in keeping the children safe.

¶ 33   Additionally, while the circuit court recognized that respondent had completed parenting and domestic violence services and engaged in visitation, the court was nevertheless troubled by his failure to demonstrate that he could apply what he had learned in practice with his children. Notably, he repeatedly told the minors that they are going to be coming home, and he completely refused to undergo any testing for substances, for reasons that were at best superficial. The court explained that the evidence of respondent's concerning behavior specifically covered the time after November 2023, thus applying as well to the State's allegations of failure to make reasonable efforts or progress.

¶ 34   Next, the circuit court acknowledged that respondent had been on a waitlist to receive mental health counseling from late October 2023 until February 2024. Despite the wait, the circuit court noted that respondent failed to complete mental health services, and was only waitlisted because he had to reengage in services following an unsuccessful discharge. Addressing the lack of clarity regarding the extent of mental health services he received, the circuit court added that it did not find respondent to be a credible witness regarding the alleged counseling he received outside of DCFS's referrals. Nor did the circuit court find it incumbent upon respondent's caseworker to try to obtain this documentation when respondent failed to provide it. Furthermore,

11

the circuit court found that respondent was aware of his service plan requirements and could not claim a lack of knowledge.

¶ 35    Turning to the State's allegation of lack of reasonable efforts, the circuit court reiterated its prior findings, clarifying that it measured said efforts by a subjective standard taking into consideration respondent's circumstances and the reasons for which the minors were removed. Although respondent was never recommended for substance abuse services, the circuit court found that his failure to submit to even one drug screen nevertheless made the issue of substance abuse a concerning one under the circumstances of the case. Respondent's drinking was a factor in the children's removal, along with domestic violence in the home. While respondent did complete domestic violence services, the circuit court found that his overall efforts to complete his service plan did not amount to reasonable efforts. The circuit court made this finding as to both nine-month periods alleged in the State's motions—from November 21, 2023, to August 21, 2024; and from April 23, 2024, to January 23, 2025.

¶ 36    Lastly, the circuit court addressed the State's allegation of lack of reasonable progress, which the circuit court reviewed under an objective standard, without making allowances for the particular challenges respondent may have faced. The circuit court explained that, in order to find reasonable progress, it must "objectively conclude that the parent's progress is sufficiently demonstrable and with such a quality that the children can be returned to the parent within the near future." The circuit court found that this was not shown here. This was again due to the lack of completed drug tests and lack of engagement in mental health counseling, as well as the circuit court's previously-articulated concerns about whether respondent could apply anything he learned when it came to actually parenting his children. The circuit court then set the matter for a best-interest hearing.

12

¶ 37                              C. Best-Interest Hearing

¶ 38    Prior to the hearing, DCFS submitted a best-interest report on May 12, 2025. According to the report, Cashmere was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and autism. He was in the seventh grade and received special accommodations and an individualized education plan. He was developmentally on-target and had made "great improvements" at school over the past year. He appeared well-adjusted in his foster home.

¶ 39    His younger brother, Finest, was diagnosed with disruptive mood dysregulation disorder and autism. He had undergone one psychiatric hospitalization since entering foster care, but he was doing well on medication, and his caregiver reported that he was doing fine overall. Prior to the hospitalization, he had multiple disruptions to his foster placements due to behavioral issues, but he had made significant progress over the last year and stabilized well in his current placement.

¶ 40    Regarding their current placement, the brothers lived in the same foster home—Cashmere since January 2024 and Finest since October 2024. The report stated that both minors were doing well with their foster mother and appeared bonded to her. They relied on her to meet their needs, and both had approached her unprompted to seek hugs. Cashmere had asked his foster mother whether he could stay with her if he could not go home with respondent. If the minors could not return to him, the foster mother stated that she was willing and able to provide them permanency through adoption. She was also committed to being a safe, stable, and nurturing caregiver to them, and had demonstrated as such during their time with her. The foster family treated the boys as their own children, and their emotional, physical, and medical needs were being met in this placement. The boys had developed trust with their foster mother and expressed their wish to remain with her if they were unable to return home.

¶ 41 Regarding the minors' relationship with respondent, the report stated that their caseworker observed respondent to have a strong bond with his sons. He spoke highly of them and the boys expressed that they love their father and look forward to their time with him. The caseworker noted that the minors both had "an unwavering dedication" to respondent. However, the report also mentioned the ongoing concerns throughout the case about respondent's inappropriate conversations with the minors—respondent "spent more time complaining about DCFS and his frustrations" with the case than he spent working towards completing his services and reunification.

¶ 42 Additionally, respondent's visitation attendance was inconsistent throughout the case, and when he did attend, there were concerns about his conversations and conduct. After the circuit court changed the permanency goal to substitute care pending termination of parental rights in January 2025, respondent's visits were reduced from weekly to bi-weekly, and finally to monthly. Respondent chose not to visit his sons in person since February 2025, blaming this on a new visitation worker being assigned to his case. Despite attempts to discuss visitation with respondent, he was not receptive or responsive. DCFS's position was that while respondent cared for his children, he had not been fully committed to reunification with them. DCFS concluded the report by recommending that the circuit court find it in the minors' best interests to terminate respondent's parental rights.

¶ 43 The best-interest hearing began on May 14, 2025. Respondent's counsel was present, but respondent failed to appear. The circuit court found that respondent had actual notice of the hearing, and his failure to attend amounted to a waiver of his right to be present. The circuit court then heard statements from both minors. Cashmere told the circuit court that he wanted to go home

14

and he missed his father. He enjoyed his visits with him. He also thought that he and his brother should be able to go home because their father was a very nice and trustworthy person.

¶ 44    Finest said he thought they should go back to their father because their father was honest, nice, and did not do anything wrong. He accused respondent's girlfriend of lying about respondent being the cause of her injuries on the night of the inciting incident, and said she was to blame for the minors' removal. He further testified that when he and his brother lived with respondent, things were going well, and they had a good relationship.

¶ 45    After the minors gave their statements, Warfield testified for the State. She said that both minors were doing well in their current foster home, and were very glad to be reunited with one another after Finest was moved to his brother's foster placement. They were very bonded to each other and to their foster mother. Warfield had personally observed Finest hugging the foster mother and both boys acting comfortable around her. She was also aware that both boys had expressed their desire to stay with her if they were unable to return to respondent.

¶ 46    Warfield also testified that the foster mother was "more than happy" to provide permanency for both minors through adoption, and that she was a great advocate for the minors. She made sure they attended medical appointments, including specific care for their developmental and mental health diagnoses. She made sure that their physical, mental health, and emotional needs were met. Both boys were also doing very well in school; in the past year, they both excelled academically and made friends. Warfield explained that there were two other children in the foster home—another foster child and an adoptee. The boys got along well with them and were bonded with the other children. They also helped out around the home.

¶ 47    Warfield testified that the minors had experienced a lot of instability prior to their current placement. Finest had had four prior placements and one hospitalization due to his mental and

15

behavioral challenges, but in his current placement, he was stable and doing well on medication. Warfield stated that the current home was the best the boys had had in terms of stability and that there had been no disruptions at this placement. It was Warfield's opinion that it was in their best interests to remain with the foster family.

¶ 48    On cross-examination, Warfield testified that the foster mother was somewhere in her 50s or 60s, and there was no second foster parent. She explained that one of the other children in the home was a disabled 16-year-old, who did not assist the foster mother with caring for the four children. However, Warfield added that the foster mother had a strong support system—her family was very close-knit, and her own mother and brother helped her out. When the foster mother was at work, the children were either at school, summer activities, or cared for by her brother.

¶ 49    Warfield was also asked whether the foster mother had voiced any intention to keep the boys in contact with their father if his rights were terminated. She explained that the foster mother did not have an issue with him maintaining contact if it was supervised, and had even tried to reach out to respondent; however, he never responded. She further testified that the boys had never expressed feeling unsafe with their father and reaffirmed that they were both dedicated to him. In the past, they were upset whenever visits were cancelled or respondent failed to show up. She added that respondent's visits had been very inconsistent in the past year.

¶ 50    Following argument, the circuit court ruled that the State had met its burden of proving by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of the minors. The circuit court explained that while some of the statutory best-interest factors did weigh in favor of respondent, the totality of the factors supported termination.

¶ 51    The circuit court began its review of the statutory factors by stating that the strongest factor underpinning its ruling was the minors' need for stability and permanence. While the circuit court

16

recognized that respondent shared a strong bond with his sons, it noted that the minors were also very attached to the foster family, and would experience a continuity of that affection if they remained in that home. By failing to complete his services, respondent had not demonstrated that he could provide his sons with the stability they needed. The minors had been in care for a long time, both together and apart, and were now living together in a placement that put them on a path to permanence.

¶ 52 The circuit court continued that the minors got along well with the foster family, including the other children. They were cared for and experienced attachment, love, security, and familiarity in the home. The circuit court recognized that this cut both ways, as the minors also had a strong relationship with their father, but the circuit court ultimately found that the State had met its burden of proof on this point.

¶ 53 The circuit court next addressed the children's wishes and goals, noting that they "articulated very decisively" to the circuit court their strong desire to live with respondent. However, the circuit court found that this evidence was mitigated by Warfield's testimony that the minors had also expressed a "firm and strong" desire to stay in their foster placement if they could not return to respondent. In light of the evidence that both minors were thriving in the foster home, as well as the finding that remaining where they were would be best for their stability, the circuit court concluded that it would be in the minors' best interests to terminate respondent's parental rights. The circuit court also changed the permanency goal to adoption.

¶ 54 The circuit court later vacated its best-interest finding and held a continued hearing on this matter on August 20, 2025, after determining that respondent had missed the original hearing due to confusion over the hearing date, and that he should have the opportunity to testify. At the start of this hearing, the circuit court explained that it would still be considering the evidence presented

17

at the first hearing but would make a new best-interest ruling after considering respondent's testimony.

¶ 55 Respondent testified that he last saw the minors approximately three months earlier, at their current foster placement. He stated that if he were allowed to keep his parental rights, he had no issue submitting to the drug screens he had previously failed to do; he also stated that he did not use drugs. Respondent said he loved his children, would never hurt them, and wanted the opportunity to continue raising them and watching them grow up. He added that he was employed, taking classes in business administration, and making plans to further his career; he also apologized for his past mistakes and stated that he wanted the chance to be a role model for his sons. He further testified that he worried for the safety of his sons while they had been in care and felt that they had been exposed to certain things like "sex and the gang stuff" while outside of his guidance and parenting.

¶ 56 During arguments, the guardian *ad litem* stated that he agreed with the State's position that termination was in the best interests of the minors. At the conclusion of the hearing, the circuit court again reviewed the evidence against the statutory factors, and noted the immense difficulty of this case in light of respondent's and the minors' clear love for one another. However, the circuit court explained that it must look at the entirety of the case, which included the 2023 best-interest hearing.

¶ 57 The circuit court stated that the factor regarding development of the children's identities fell in respondent's favor, as he was their father. The circuit court found the factor of the children's sense of attachment to go in favor of termination, although the circuit court noted that it could have gone either way, and termination "barely" won out, given the evidence on both sides. The circuit court reiterated its previous findings regarding the minors' various needs being met, how well they

18

were doing academically, their sense of security and stability, their relationship and familiarity with the foster family, and the stability and permanence that remaining in their current placement provided. The circuit court similarly found that the wishes and goals of the children went in favor of both sides as well, as there was evidence that the minors expressed wishes to live with both respondent and their foster mother.

¶ 58　　The circuit court added that if the minors had not been placed together, or if they felt uncomfortable in their placement, the circuit court would rule against termination. However, in light of the circuit court's prior findings and the history of this case, which included the 2023 best-interest hearing, the circuit court again ruled that termination was in the best interests of the minors. This appeal followed.

¶ 59　　　　　　　　　　　　II. ANALYSIS

¶ 60　　On appeal, respondent argues that the circuit court's findings that he was an unfit parent and that termination of his parental rights was in the best interest of the children were against the manifest weight of the evidence. For the following reasons, we reject both contentions.

¶ 61　　　　　　　　A. The Circuit Court's Finding of Unfitness

¶ 62　　A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *In re Gwynne P.*, 215 Ill. 2d at 354. Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024); 750

ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 63   As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare.
>
> * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2024).

¶ 64   A finding of unfitness under subsection (D)(b) of this provision is based on a subjective analysis, which focuses not on the parent's success, but rather on the reasonableness of his efforts, taking into account his particular difficulties and circumstances. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating some interest in or affection towards the child does not render a parent fit under this subsection; rather, his interest, concern, and/or responsibility must be reasonable. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Unlike subsection (D)(m), subsection (D)(b) has no time constraint that limits our consideration of respondent's fitness. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Both noncompliance with a service plan and infrequent or irregular visitation with the child have been held to be sufficient evidence warranting

a finding of unfitness under this subsection. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 65    Under the Adoption Act, "reasonable efforts" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34.

¶ 66    "Reasonable progress," by contrast, is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

See also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 ("The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001))).

¶ 67    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The

21

lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 68   Here, the circuit court found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility regarding the minors, and failed to make reasonable efforts or progress towards return of the minors. On appeal, respondent first argues that there was no evidence presented to support a finding of failure to maintain reasonable interest, concern, or responsibility as to the minors' welfare, and ample evidence to the contrary. Respondent contends that the circuit court based its decision on evidence that was not relevant to this ground for unfitness, specifically his allegedly inappropriate conversations with the minors, his failure to participate in drug screens, and his failure to engage in mental health counseling. Furthermore, the circuit court stated that if it confined its review solely to visitation, it "would obviously not be able to find that the State has come even close to meeting its burden." He adds that his caseworker admitted that his visits went well, with only a few cancellations for valid reasons like work or a death in the family.

¶ 69   We recognize that the circuit court was presented with uncontroverted evidence of respondent's love for his children and of his visits generally going well, when they occurred. However, showing affection for his children is insufficient to demonstrate fitness. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Furthermore, the record also contains evidence that respondent's

22

visitation attendance was inconsistent, and that respondent made inappropriate comments to his children about DCFS and the case. DCFS also reduced the frequency of his visits as these issues worsened. The circuit court found that these behaviors evidenced respondent's inability to apply in practice what he had learned while working through his service plan. We note that we afford significant deference to the circuit court's determinations of witness credibility and its balancing of conflicting evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. We therefore will not substitute the circuit court's findings with our own conclusions on this point.

¶ 70 The circuit court also looked at respondent's history of failure to engage in services, multiple instances of unsatisfactory discharge, and complete failure to undergo drug testing. Despite his eventual completion of parenting and domestic violence services, the circuit court found that his performance over the history of the case indicated a lack of interest in keeping his children safe. Additionally, noncompliance with a service plan and inconsistent visitation have been found to be sufficient evidence of unfitness under subsection (D)(b) of the Adoption Act. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. We thus find that the circuit court's ruling of unfitness under this subsection was not against the manifest weight of the evidence.

¶ 71 Next, respondent argues that the circuit court erred in determining that he failed to make reasonable efforts to correct the conditions that brought his children into care based on his failure to engage in drug screens and failure to complete mental health services. He contends that he did make efforts to complete these services, and successfully completed parenting and domestic violence services. He also completed a substance abuse assessment at the start of the case, and was not recommended for further treatment. He also argues that he did participate in counseling to the best of his ability, despite his unsuccessful discharge. Respondent concludes that he adequately addressed the reasons he did not complete the two aforementioned services during his testimony,

23

explaining why he was hard to reach by phone and often out of town, and that he was confused as to the drug screen requirement, given his assessment results.

¶ 72     The circuit court indeed heard and considered respondent's testimony about living out of town and his mishaps with broken phones that allegedly explained his changing contact information. However, the circuit court explained that it found respondent lacking in credibility, and as previously stated, we defer to this finding. Additionally, Warfield testified to her efforts at reaching respondent, including multiple phone calls at multiple numbers, mailing letters to his residence, and attempting to intercept him at home. She also stated that respondent was required to inform DCFS of any changes to his contact information. Respondent's testimony about missing drug screens due to being out of town or failures in communication was insufficient to excuse his poor noncompliance.

¶ 73     The circuit court was also presented with evidence that respondent's substance abuse assessment was based on self-reporting, and that there were concerns about his sobriety given the incident that started this case. Considering that the circuit court subjectively reviews respondent's efforts to correct the specific conditions that led to the minors' removal, this was a significant factor in the circuit court's unfitness ruling. While he did complete domestic violence services, which was also relevant to the reasons for the minors' removal, the work he put into completing his service plan over the nine-month periods identified by the State did not amount to reasonable efforts. We find that the circuit court's findings on this ground for unfitness were not unreasonable, arbitrary, or contrary to the evidence presented; thus, the circuit court's determination was not against the manifest weight of the evidence.

¶ 74     Lastly, respondent argues that the evidence shows that he made reasonable progress. In addition to the points discussed above, he adds that he completed parenting services in March

24

2024, which fell within both of the State's alleged nine-month periods, and completed domestic violence services in December 2024, by the end of the later period. He adds that he was engaging in mental health services, despite not yet completing them.

¶ 75 Respondent acknowledges that he did not complete all of his services in either of the two nine-month periods relevant to the circuit court's ruling. Furthermore, there is no support for his supposition that completion of *any* services precludes a finding of unfitness based on lack of reasonable progress. The question is not whether respondent made *any* progress; it is whether he made *reasonable* progress. The circuit court explained that, based on respondent's failure to complete mental health counseling and to submit to any drug testing, it could not find that his progress was sufficient to show that the minors could be returned to him in the foreseeable future. The circuit court added that its conclusion was also based on its concerns about whether respondent could apply anything he learned when it came to actually parenting his children. There was also evidence in DCFS's reports that even when respondent did engage in services, he was merely going through the motions, and he did not take responsibility for why his children were removed. We thus find that the circuit court's fitness determination on this ground was not against the manifest weight of the evidence.

¶ 76                 B. The Circuit Court's Best-Interest Finding

¶ 77 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. At this stage of the termination proceedings, the

25

State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 78 In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See also 705 ILCS 405/1-3(4.05) (West 2024).

¶ 79 As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 80 On appeal, respondent admits that the circuit court "did a sufficient job weighing the statutory factors and applying the facts to the same," continuing on that the circuit court "explicitly stated each [factor], provided relevant context, and explained its decision." However, respondent argues that the circuit court's ultimate decision was against the manifest weight of the evidence, specifically because of the children's testimony and the circuit court's failure to consider that testimony as it applied to the factor of "the uniqueness of every family and child." 705 ILCS 405/1-3(4.05)(h) (West 2024).

¶ 81 In making its best-interest decision, the circuit court noted how difficult and close of a case this was, and found that some statutory factors either favored respondent, or could favor either side. Notably, the circuit court found that the development of the minors' identities fell in respondent's favor, as their father. The circuit court was also clear that there was no doubt of respondent's love for his children, and of the bond they shared. The circuit court further noted the significance of both minors' statements in court, in which they expressed desires to live with respondent.

¶ 82 However, the circuit court ultimately determined that the total balance of the statutory factors narrowly fell in favor of termination. The evidence uncontrovertibly showed that both minors were doing well in their current placement on all measures—their physical and emotional needs were met, they were bonded with, loved by, and comfortable around the foster family, and they were thriving academically and socially. Furthermore, both minors had expressed that they wished to stay in their foster placement if they could not return to their father. The circuit court placed significant emphasis on this last point in finding that the statutory factor of the minors' wishes and goals could weigh for or against termination.

¶ 83 The circuit court further explained that its decision would have been different had the minors not been placed together, and if they did not feel comfortable with the placement. The evidence showed that there were no concerns with the minors' placement, neither in terms of safety nor in terms of their comfort. The minors were attached to their foster family and both sought affection from their foster mother. While they also clearly shared these feelings for respondent, the circuit court ultimately reviewed the factor of stability and permanence to conclude that termination was in their best interests. Both minors were diagnosed with multiple conditions impacting their development and mental health, and the younger child in particular demonstrated

a strong turn-around in his mental health and stability while in his current placement. Their foster mother also made sure the minors were receiving the academic accommodations they needed, and both were doing very well in school.

¶ 84　The circuit court noted the length of time that the minors had been in care—over three years—and how much instability they had experienced in that time. By contrast, the circuit court described them to be on the path to stability and permanence in their current placement, and found that this factor fell in favor of termination. The circuit court also heard that the foster mother was willing and able to adopt the minors. She also attempted to speak with respondent about keeping the minors in contact with him, but respondent did not reply. Additionally, respondent was given the opportunity to testify, and could not identify any credible concerns regarding the minors' placement. While we share the circuit court's awareness of the difficulty of this case, we conclude that its best-interest ruling was not against the manifest weight of the evidence.

¶ 85　　　　　　　　　　　　III. CONCLUSION

¶ 86　For the reasons stated, the circuit court did not err in terminating respondent's parental rights over the minors. The judgment of the circuit court is affirmed.


¶ 87　Affirmed.