NOTICE
Decision filed 03/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250890-U

NOS. 5-25-0890, 5-25-0891, cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* REESE M. and REMI M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois. | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 24-JA-22, 24-JA-23 |
| | ) | |
| KAYLE B., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CLARKE delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1     *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's order terminating the respondent's parental rights to her children where the evidence supported the trial court's findings and there is no meritorious argument to the contrary that appellate counsel can raise on behalf of the respondent.

¶ 2     In this consolidated appeal, the respondent, Kayle B. (Mother), appeals an order of the circuit court of Champaign County terminating her parental rights to two of her children. Attorney John B. Hensley, who was appointed to represent Mother on appeal, has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). Hensley states that there are no arguably meritorious claims he can raise on behalf of Mother because (1) the trial court's findings of unfitness were supported by the evidence and (2) the trial court's determination that termination

1

of parental rights was in the children's best interest was likewise supported by the evidence. We grant Hensley's motion to withdraw and affirm the order of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4    This case began on February 28, 2024, when the State filed petitions for adjudication of neglect, abuse, or dependency for Mother's minor children, Reese M. and Remi M., twin boys born in August 2020 in the following cases: case Nos. 24-JA-22 and 24-JA-23. The first case involved Reese M., and the second case involved Remi M. Because the pleadings that followed are, for the most part identical, we will refer to the pleadings in case No. 24-JA-22 unless otherwise noted, and we will discuss the cases collectively wherever possible. The petitions alleged that the children were neglected by virtue of being in an environment injurious to their welfare because they were exposed to substance abuse while in Mother's care. See 705 ILCS 405/2-3(1)(b) (West 2022). A separate case was opened involving Mother's older son, Kayden L., who was born in October 2008.[1]

¶ 5    Along with the petition, the State filed a shelter care report addressing all three of Mother's children. The report indicated that on January 22, 2024, the Department of Children and Family Services (DCFS) received a report that the home where Mother resided with the three children resembled a "crack house" due to the number of people entering and leaving. The home was reported to be filthy, with bathrooms that were "not suitable for use," rotting food present throughout the home, and a dog locked in a bedroom where he defecated and urinated. In addition, the 3-year-old twins reportedly were left in the care of their 15-year-old brother for days while Mother "went missing," and Mother was reported to use drugs in the home while the children were

---

[1]Kayden's father is deceased and, as such, was never a party to these proceedings. Although Reese and Remi's father, Ray M., was a respondent in the proceedings before the trial court, he filed a separate appeal and is not a party to this appeal. Kayden's case is not before us in this appeal. We will discuss matters related to Kayden and Ray only to the extent they are pertinent to resolution of the issues before us.

present. The report noted that she had a hole in her nose resulting from her past use of cocaine. A subsequent visit to the home by DCFS child protection investigators confirmed this description of the children's living environment. Over the next several weeks, attempts were made to engage Mother in intact services. However, on February 27, 2024, the children were taken into protective custody.

¶ 6    The trial court held a shelter care hearing on February 28, 2024. Mother stipulated to the allegations of neglect and to the urgent and immediate need for temporary custody. The court entered a temporary custody order that same day placing the children in the custody of DCFS.

¶ 7    On April 30, 2024, the court held an adjudicatory hearing. The children's father, Ray M. (Father), waived adjudication, and Mother stipulated to the allegations in the petition. The trial court entered an adjudicatory order finding that the twins were neglected and that the neglect was imposed by Mother.

¶ 8    On May 28, 2024, the court held a dispositional hearing. The same day, it entered a dispositional order making the twins wards of the court.

¶ 9    On August 19, 2024, after a hearing, the court entered the first permanency order in this case. It set a goal of return home within 12 months and found that Mother did not make either reasonable efforts or reasonable and substantial progress toward that goal.

¶ 10    The next permanency hearing took place on December 16, 2024. The court entered a permanency order that day, maintaining a goal of return home within 12 months. Neither the order nor the docket sheet included findings concerning reasonable efforts or reasonable and substantial progress.

¶ 11    The court entered another permanency order after a hearing on April 14, 2025. The court again found that Mother did not make either reasonable efforts or reasonable and substantial

3

progress toward the return of the children to her care. However, the court maintained a goal of return home within 12 months.

¶ 12    On May 19, 2025, the State filed a motion for a finding of unfitness and to terminate parental rights. It alleged that both parents were unfit on the following three grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of the children during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(ii)). The petition identified the nine-month period between August 19, 2024, and May 19, 2025, for purposes of both failure to make reasonable efforts and failure to make reasonable progress.

¶ 13    On August 26, 2025, the trial court held a hearing on the parents' fitness. The first witness to testify for the State was Austin Schmohe, a foster care family caseworker from the Center for Youth and Family Solutions (CYFS). Schmohe served as the family's caseworker from April 2024 until February 2025 although he began transitioning the case to the new caseworker before he left. He testified that the children came into care due to allegations that their home was dirty, they lacked food, there was substance abuse in the home, and they were left alone in the care of their older brother. The requirements in Mother's service plan included substance abuse treatment, weekly drug tests, individual therapy, family therapy with her older son, maintaining a stable income, providing proper housing for the children, parenting classes, and attending weekly visits with her children. Schmohe stated that he met with Mother to explain what was required of her and he made all necessary referrals for services early in the case.

4

¶ 14    Schmohe testified that Mother successfully completed a 30-day inpatient substance abuse program with Gateway Foundation in April and May of 2024. However, she was referred to an outpatient program for continuing treatment, and she failed to engage in that program. She completed a second 30-day inpatient treatment program at Gateway in approximately August of 2024, but she again failed to participate in the required follow-up outpatient treatment. Schmohe provided Mother with referrals to outpatient treatment programs for follow-up treatment both times, but she did not engage.

¶ 15    When asked if Mother cooperated with the requirement of drug tests between April 2024 and February 2025 Schmohe replied, "Not completely. Not regularly." He testified further, "There were a couple of times that I remember she, she did successfully complete a drop." He stated, however, that each time she complied, the results were positive for THC and methamphetamine.

¶ 16    Addressing the requirement of individual therapy, Schmohe testified that Mother was initially placed on a waiting list for a referral to an individual therapist. He explained that she was eventually referred to a licensed therapist through CYFS's in-house therapy department. He stated, however, that she did not follow through with scheduling an appointment.

¶ 17    Regarding parenting classes, Schmohe testified that he made multiple referrals. He made the first referral to parenting classes while Mother was in an inpatient substance abuse program. As a result, he had to make another referral. As of February 2025 when he left the case, Mother had not completed parenting classes.

¶ 18    Next, Schmohe testified at length concerning Mother's visitation with the twins. He explained that she had supervised visits of two hours scheduled once a week. Although the frequency of the visits did not change, the specific day and time visits were scheduled did change a few times to attempt to accommodate Mother's schedule. Schmohe testified that Mother missed

5

scheduled visits. He explained that, pursuant to agency policy, a parent who exhibits a pattern of missing visits or arriving late will be required to send a text message or call the caseworker to confirm visits in advance. According to Schmohe, Mother became subject to this requirement "relatively early in the case," although he did not recall specifically when that occurred. Even after this requirement was imposed, there were issues with visits being canceled.

¶ 19     Schmohe testified that when Mother missed drug tests and visits with the twins, her usual explanation was that she slept late, forgot, or "was busy doing something." He noted that Mother told him the medication she was taking sometimes caused her to sleep through her alarm clock. In addition, he noted that transportation to the drug tests was an issue. Asked about any efforts to help Mother overcome the transportation problem, Schmohe testified that he provided her with information about C-CART, a system of buses that runs between Champaign (where the drug tests took place) and the city where Mother lived. He noted that C-CART offered a "group ride share" type of point-to-point service, but he did not attempt to arrange this service for Mother due to the program's strict attendance requirement. He explained that he would set this up for her only if she could demonstrate regular attendance.

¶ 20     Schmohe testified that the only services Mother successfully completed while he was the family's caseworker were obtaining stable housing and income. He explained that she received Social Security Disability Income (SSDI). He noted that although housing was initially a problem due to the condition of her apartment, the problem was quickly resolved. When he left the case in February 2025 CYFS was not close to returning the children to Mother's care.

¶ 21     After giving testimony related to Father, Schmohe was asked if either parent ever gave him any gifts, cards, or letters to give the children. He indicated that they did not. In addition, he testified that both parents were difficult to contact at times. He noted that Mother frequently failed

6

to respond to text messages and voicemails. There was a period during the summer of 2024 where he did not hear from her for an entire month. Typically, however, it would take a day or two for Mother to get back to him. Each time, her explanation for the delay was that her phone was broken or stolen or she had no service.

¶ 22    On cross-examination, Mother's counsel asked Schmohe about Mother's participation in parenting classes. According to Schmohe, Mother told him she completed a parenting class at Gateway, but he did not receive documentation of this. Moreover, the class did not satisfy CYFS's requirements due to the length of the course. Schmohe did not attempt to verify Mother's participation in the class because the course did not satisfy agency requirements.

¶ 23    Mother's counsel also asked about Mother's difficulty with transportation. Schmohe testified that visits with the children were moved to the public library early in the case so they would be closer to where Mother lived. However, drug drops took place in Champaign because there was no closer place available. Schmohe acknowledged that he did not look into any services other than C-CART to help Mother overcome her difficulty with transportation to drug tests. He further acknowledged that there was no funding available to help Mother pay for use of C-CART at that time.

¶ 24    On redirect examination, Schmohe testified that Mother's attendance at visits improved after they were moved to the public library. He stated, however, that she still missed visits frequently.

¶ 25    The State's next witness was Sanya Thompson, who became the caseworker on January 22, 2025. She first testified concerning Mother's housing during the time she was the caseworker. Thompson visited Mother's home for a home safety check on March 19, 2025, and rated it as unsatisfactory. Problems included broken cabinets, dog feces stains on the floor, peeling paint,

7

holes in the wall, a bathroom tap that had no running water, and the absence of smoke detectors in the kitchen and bedroom. In addition, chemicals were stored in the bottom of a cabinet.

¶ 26   When Thompson visited the home, an individual was staying in Mother's apartment along with his dog. Although Thompson asked Mother who the individual was, she refused to tell her. Thompson noted that Mother said the individual had his own apartment.

¶ 27   Thompson next testified concerning the requirement that Mother engage in individual therapy. She was specifically asked to address the period between January 22, 2025, when she became the caseworker, and May 19, 2025, when the motion to terminate parental rights was filed. Thompson stated that Mother was referred to Cecilia Guerrero, a CYFS in-house certified therapist. Mother was informed of the referral on March 28, 2025, and Guerrero "reached out to her several times." Thompson testified that Mother "said that she would engage," but she missed multiple visits and said she would try to make them up the following week.

¶ 28   Thompson was next asked about parenting classes. She testified that between January 22, 2025, and May 19, 2025, Mother did not complete a parenting class.

¶ 29   Thompson testified that during this same time period, Mother cooperated with some, but not all, required drug drops. She further testified that Mother tested positive for alcohol, THC, and amphetamines each time she did comply. Thompson noted that Mother indicated the positive results for amphetamines were due to a medication she took to help her sleep; however, she did not provide any explanation for the positive results for THC or alcohol.

¶ 30   Regarding visits with the children, Thompson stated that Mother had two-hour supervised visits once a week when she first became the caseworker. However, at some point in May or June of 2025, those visits were shortened to one hour because Mother was often on her phone instead of engaging with the children or properly supervising them during visits. Thompson testified that

8

visits continued to take place at the public library between January 22 and May 19, 2025. She did not recall any of the visits being cut short during that period.

¶ 31    As of May 19, 2025, Thompson was not close to returning the children to Mother's care. She explained that Mother had not completed her required services and had not corrected the conditions that brought the children into care.

¶ 32    In response to questioning by the guardian *ad litem* (GAL), Thompson testified that Mother was discharged from an inpatient substance abuse program a third time in mid-March 2025. Upon Mother's discharge from the inpatient program, Thompson referred her to an outpatient program in the city where she lived, but Mother did not engage in the program or provide any explanation for her failure to do so.

¶ 33    On cross-examination, Thompson testified that Mother's parents offered to drive her to her required drug drops in Champaign.

¶ 34    Announcing its fitness ruling from the bench, the court found that the State proved Mother unfit by clear and convincing evidence on all three asserted grounds. The court recognized that two of those grounds—failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare and failure to make reasonable efforts to correct the conditions that led to their removal—involved a subjective standard. The court stated that the question of whether these grounds were proven was a "closer" call than the question of whether the State had proven that mother failed to make reasonable progress.

¶ 35    Turning its attention to the facts and circumstances of the case, the court noted that although Mother had stable housing, her housing was not suitable for the children. In addition, she never took the parenting class the agency required and did not begin individual counseling when it became available. The court stated that Mother "deserves credit for going to inpatient treatment

9

and completing it." However, the court also noted that she did not follow through with necessary outpatient care. Moreover, Mother missed many drug tests and tested positive when she did comply with the testing requirement.

¶ 36    The court found it "very significant" that Mother's visits with the children never progressed to unsupervised visits and that she had to be told to engage with them during visits. The court emphasized that there was no point at which the caseworkers were close to ready to return the twins to Mother's care.

¶ 37    Finally, the court addressed the subjective "reasonable component." The court expressed concern with the agency's failure to assist Mother in obtaining transportation from the city where she lived to Champaign through C-CART. However, the court noted that Mother's parents were willing to drive her to Champaign for drug screens and that her inconsistency in attending visits with the children continued even after they were moved to the public library. As such, the court did not find Mother's efforts reasonable.

¶ 38    The court also found that the State had proven Father unfit on all three grounds alleged. court entered a written order on parental fitness that day, finding both parents unfit on all grounds.

¶ 39    On September 22, 2025, Alexis Krones, the children's Court Appointed Special Advocate (CASA), filed a Permanency Report in advance of the scheduled best-interest hearing. In an introductory section, she noted that the twins were five years old, attended kindergarten, and were "on track" for their age in terms of their development and education. She further noted that the boys played well together and had a strong bond, although they occasionally argued as is typical of siblings.

¶ 40    The CASA report addressed the parents' visitation with the children. Mother had in-person visits scheduled every week, but the report indicated that many of these visits had to be cancelled

due to her failure to confirm visits as required. Father, who lived in Ohio, was offered supervised visits by FaceTime, but many of these visits did not occur because Father failed to respond to a caseworker or confirm a visit.

¶ 41    Krones's report next addressed the 10 statutory best-interest factors. See 705 ILCS 405/1-3(4.05) (West 2024). Regarding the welfare and physical safety of the children, Krones noted that both children attended all medical appointments. She further noted that Reese received breathing treatments at home due to asthma and wore eyeglasses, which his foster mother was "actively working to replace" after they were scratched.

¶ 42    With regard to the development of the children's identity, Krones stated that the foster mother intended to have the twins baptized in accordance with the family's religious values. As to the children's background and ties, the report noted that in their current foster placement, the twins regularly maintained contact with their extended family members, including overnight visits with their older brother, frequent visits with their maternal grandfather, and occasional visits and regular video calls with an aunt in Chicago.

¶ 43    Addressing the children's sense of attachment, Krones noted in the report that the twins were closely attached to their maternal grandmother (who was their foster mother), their maternal grandfather, and their older brother. She further noted that although both boys remembered their parents, Reese mentioned them only occasionally and Remi did not mention them at all. After visits, Reese often needed more adult attention, while Remi did not seem to be affected as much.

¶ 44    Regarding the children's wishes and long-term goals, Krones indicated in her report that the twins sought support from their grandmother. Although they occasionally asked questions about their biological parents, particularly Reese, they did not express a desire to be with their parents.

11

¶ 45    Regarding their ties to the community, the report indicated that the children attended elementary school and an after-school program, where both had made friends. In addition, the report noted that they often played with the granddaughter of one of their grandmother's friends.

¶ 46    In addressing the uniqueness of every child and family, the report described each child's individual personality. It indicated that their grandmother had demonstrated an ability to meet each child's needs and recognize their different personality traits.

¶ 47    Regarding the children's need for permanence and the risks inherent in substitute care, the report noted that the children in this case had experienced disruptions while in substitute care due to a change in their caseworker and the inconsistency in visitation with their parents. As a result, Krones believed that securing permanence for the twins was particularly important. She stated that the foster mother had "provided unwavering care and support," thus mitigating any risks of substitute care. Finally, addressing the preferences of people available to care for the children, the report indicated that their grandmother wanted to adopt them.

¶ 48    Krones concluded her report with a recommendation that the court terminate the parental rights of both Mother and Father to the children, thus allowing permanent placement and adoption. She further recommended continued support for their grandmother.

¶ 49    On the same date, a DCFS Best Interest Report prepared by CYFS caseworker Sanya Thompson was filed with the court. The discussion of the statutory best-interest factors in this report was consistent with that in Krones's Permanency Report. The report provided a few additional details, however. Regarding the development of the children's identity, the report noted that although the foster mother's racial identity was not the same as that of the twins, the twins seemed comfortable and well-adjusted in her home. With respect to the children's background and ties, the report noted that the foster mother had expressed a willingness to maintain contact with

12

the twins' biological relatives; however, she wanted Mother to complete rehab and maintain her sobriety before having further contact with the children and she did not want to have any contact with Father. In addressing both the children's sense of attachment and the uniqueness of every child and family, the report noted that the foster home was the twins' only placement since coming into care and that they had an established relationship with their foster mother prior to entering care because she was their grandmother. Finally, in addressing the preferences of available caregivers, the report noted that the foster mother had a strong support system.

¶ 50    The report briefly addressed Mother's and Father's visitation with the children. It indicated that Mother's last visit took place on August 5, 2025. Although she received a reminder of a visit scheduled for September 17, she did not attend that visit. Father's most recent video call with the children occurred on July 1, 2025. CYFS recommended that the court terminate the rights of both parents and change the goal to adoption.

¶ 51    The matter came for a best-interest hearing on October 28, 2025. The court first offered the parties an opportunity to make any corrections or additions to the reports filed with the court, following which the parties presented their arguments.

¶ 52    In announcing its ruling from the bench, the court began by stating that the children came into care due to their parents' inability "to provide a stable and safe living environment" and "even just provide the basic needs for the children," such as food clothing, and shelter. The court noted that both Mother's inability to parent the minors while they were in her care and Father's lack of involvement contributed to the problems. The court observed that there was a clear contrast with the care the minors now received in their foster home with their maternal grandmother, who provided for their basic needs and gave them stability and security.

¶ 53    Next, the court addressed the statutory best-interest factors, beginning with the development of the children's identity. The court found that although Mother played a role in helping the twins develop their identity early in their lives, neither parent had been in a position to do so for the past year and a half. In considering the children's background and ties, the court noted that their foster mother was a relative who was able to maintain contact with extended family members.

¶ 54    The court next addressed the children's sense of attachment, noting that the children had a relationship with their grandmother before they came into care. The court stated, "That bond has obviously only deepened because these two young boys have been living with her for this period of time." Based on the reports filed by CASA and DCFS, the court found that the twins viewed their grandmother "as a parental figure."

¶ 55    The court did not find the children's wishes and long-term goals to be a significant factor due to their young age. However, the court noted that their affection and bond with their grandmother was an expression of "how happy and content that they are" with her.

¶ 56    Turning its attention to the children's community ties, the court noted that they had been in their current community for over one and a half years. The court observed that the twins had ties to their school and other activities in the community, something they had been unable to develop while living with Mother due to her instability.

¶ 57    The court found that consideration of the children's need for permanence "very much [was] in favor of" terminating parental rights. The court explained that the twins' grandmother was willing to adopt them and provide them with the permanence they needed.

14

¶ 58　Addressing the uniqueness of every child and family, the court noted that the ability of twins to develop their own distinct identities could be particularly challenging. The court found, however, that their grandmother was clearly helping them to do that in this case.

¶ 59　With regard to the risks inherent in substitute care, the court noted that "there is always a risk" when parental rights are terminated. However, the court found that in this case, that risk was low because the foster mother was the children's grandmother; they had been in her care for nearly two years; and she was clearly able to provide them with the long-term stability, permanence, and care that they needed.

¶ 60　Lastly, the court addressed the preferences of people available to care for the children. The court found that neither of the parents was "really available to care for the children." The court explained that Mother could not care for the children because she had not progressed with required services. By contrast, the court noted that the children's grandmother was able to care for them. The court found that this factor weighed in favor of termination. The court concluded that the State established by a preponderance of the evidence that terminating both parents' rights was in the best interest of the twins.

¶ 61　The court entered a written termination order on the same date, October 28, 2025. Mother filed a timely notice of appeal on October 30, 2025. Hensley was appointed to represent Mother on appeal. He filed a motion to withdraw on December 29, 2025. On our own motion, this court allowed Mother until January 26, 2026, to file any *pro se* brief, memorandum, or other documents; however, she did not file a response within the time allotted.

¶ 62　　　　　　　　　　　　　　II. ANALYSIS

¶ 63　In a memorandum supporting his motion to withdraw, Hensley states that he considered raising the following issues: (1) whether the trial court's findings of unfitness were against the

15

manifest weight of the evidence and (2) whether the court's best-interest determination was against the manifest weight of the evidence. Hensley concluded that both issues would lack merit. For the reasons that follow, we agree.

¶ 64                                   A. Unfitness

¶ 65     Involuntary termination of parental rights involves a two-step process. First, the State must prove the respondent parent unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds the parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 66     We give great deference to the trial court's unfitness findings because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 67     Here, the State asserted three grounds for unfitness, alleging that Mother (1) failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period after adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress towards the return of the children to her custody during any nine-month period after adjudication of neglect (*id.* § 1(D)(m)(ii)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by

16

clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of these grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

¶ 68    In considering whether a parent failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, our "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, we must take into account any circumstances that made it difficult for the parent to demonstrate the requisite reasonable degree of interest, concern, or responsibility. *Id.* Significantly, however, a parent cannot avoid a finding of unfitness by showing *some* interest, concern, or responsibility; rather, the question is whether the parent's interest, concern, and/or responsibility is *reasonable*. *In re M.I.*, 2016 IL 120232, ¶ 30. In addition, because the statutory language is disjunctive, any one of the three elements may provide a basis for a finding of unfitness. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest or concern or responsibility. *Id.*

¶ 69    Here, undisputed evidence showed that Mother failed to complete all required services aside from providing proof that she had a stable income. In addition, the evidence showed that her attendance at visits with the children was inconsistent and she did not always engage with the children for the entire length of her scheduled visits. A parent's inconsistent visitation coupled with failure to comply with service plan requirements is sufficient to support a finding of unfitness for failure to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 70    We must also consider the evidence that Mother encountered difficulty with transportation. However, the trial court took that circumstance into account in considering whether Mother's

17

interest, concern, and/or responsibility for the twins was reasonable. As the court noted, her visitation with the children remained inconsistent even after the agency moved her visits to a location that was closer to her home, and she continued to miss drug drops even though her parents offered to drive her to Champaign. As such, we conclude that the evidence was sufficient to support the trial court's finding of unfitness for failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare, and that any argument to the contrary would lack merit.

¶ 71    Failure to make reasonable efforts to correct the conditions that brought the children into care and failure to make reasonable progress toward their return are two distinct grounds for parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *Id.* at 1066-67. This requires us to consider "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34.

¶ 72    By contrast, we measure reasonable progress by an objective standard. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. The benchmark for measuring reasonable progress is "compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress when the trial court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

18

¶ 73    We find the evidence more than adequate to support the trial court's findings of unfitness on the basis of both failure to make reasonable efforts and failure to make reasonable progress. As we have already discussed, the trial court considered the transportation impediments Mother faced in cooperating with services and found that, even with those impediments, her efforts were not reasonable. The evidence showed that the caseworkers moved Mother's visits with her children to the public library in the city where Mother lived and provided referrals to local services for her and that her parents offered to drive her to Champaign for the drug screens. Even with these accommodations, Mother made no progress on her services. She was never found to have made either reasonable efforts or reasonable and substantial progress in any of the trial court's permanency orders, and there was never a point at which the agency was close to returning the twins to her care. We thus conclude that the trial court's findings of unfitness were supported by the evidence and that any argument to the contrary would lack merit.

¶ 74                                    B. Best Interest

¶ 75    Once the trial court finds a parent unfit, the focus shifts to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best-interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 76    In deciding whether termination of parental rights is in a child's best interest, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each

child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 77    As with the trial court's unfitness finding, we review its best-interest finding to determine whether it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. As stated previously, this occurs "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 78    Here, the trial court expressly addressed each of the statutory best-interest factors. The evidence overwhelmingly showed that the children were doing well in their foster home. The evidence also established that their grandmother was providing for all their needs, maintaining their connections with extended family members and their community, and offering them the permanence and stability they needed. We do not believe the trial court's best-interest determination was unreasonable or arbitrary, nor do we believe the opposite conclusion was clearly evident. See *Id*. Therefore, we conclude that any claim that the court's decision was against the manifest weight of the evidence would lack merit.

¶ 79                                    III. CONCLUSION

¶ 80    For the foregoing reasons, we grant Hensley's motion to withdraw, and we affirm the order of the trial court terminating Mother's parental rights.

¶ 81    Motion granted; order affirmed.

20